NIELSEN, ADMINISTRATOR, *v.* JOHNSON, TREASURER.

No. 115. Argued January 9, 10, 1929.—Decided February 18, 1929.

48

*Mr. Nelson Miller* for petitioner.

*Mr. John Fletcher,* Attorney General of Iowa, with whom *Messrs. C. J. Stephens,* Assistant Attorney General, and *Albert H. Adams* were on the brief, for respondent.

Mr. Justice Stone delivered the opinion of the Court.

This case is here on certiorari, granted June 4, 1928, 277 U. S. 583, under § 237 of the Judicial Code, to review a judgment of the Supreme Court of Iowa affirming a judgment of the Plymouth District Court imposing an inheritance tax on the estate of petitioner's intestate. Anders Anderson, the intestate, a citizen of the Kingdom of Denmark residing in Iowa, died there February 9, 1923, leaving his mother, a resident and citizen of Denmark, his sole heir at law and entitled by inheritance, under the laws of Iowa, to his net estate of personal property, aggregating $3,006.37. By § 7315, Code of Iowa (1927), c. 351, the estate of a decedent passing to his mother or other named close relatives, if alien non-residents of the United States,

is subject to an inheritance tax of 10%, but by § 7313 an estate of less than $15,000, as was decedent's, passing to a parent who is not such a non-resident alien is tax free. In the proceedings in the state court for fixing the inheritance tax, petitioner asserted that the provisions of the statutes referred to, so far as they authorized a tax upon this decedent's estate, were void as in conflict with Article 7 of the Treaty of April 26, 1826, between the United States and Denmark, 8 Stat. 340, 342, renewed in 1857, 11 Stat. 719, 720, reading as follows:

"ARTICLE 7. The United States and his Danish Majesty mutually agree, that no higher or other duties, charges, or taxes of any kind, shall be levied in the territories or dominions of either party, upon any personal property, money or effects, of their respective citizens or subjects, on the removal of the same from their territories or dominions reciprocally, either upon the inheritance of such property, money, or effects, or otherwise, than are or shall be payable in each State, upon the same, when removed by a citizen or subject of such State respectively."

The Supreme Court of Iowa, 205 Iowa 324, following its earlier decision, *In re Estate of Pedersen,* 198 Iowa 166, upheld the statute as not in conflict with the Treaty.

In *Petersen* v. *Iowa,* 245 U. S. 170, this court held, following *Frederickson* v. *Louisiana,* 23 How. 445, that Article 7 was intended to apply only to the property of citizens of one country located within the other and so placed no limitation upon the power of either government to deal with its own citizens and their property within its own dominion. Hence, it did not preclude the inheritance tax there imposed upon the estate of a resident citizen of Iowa at a higher rate upon legacies to a citizen and resident of Denmark than upon similar legacies to citizens or residents of the United States. The court said (p. 172):

" Conceding that it [Article 7] requires construction to determine whether the prohibitions embrace taxes ge-

nerically considered, or death duties, or excises on the right to transfer and remove property, singly or collectively, we are of the opinion that the duty of interpretation does not arise since in no event would any of the prohibitions be applicable to the case before us."

But, in the present case, the decedent was a citizen of Denmark, owning property within the State of Iowa, and Article 7, by its terms, is applicable to charges or taxes levied on the personal property or effects of such a citizen; hence its protection may be invoked here if the discrimination complained of is one embraced within the terms of the Treaty.

That there is a discrimination based on alienage is evident, since the tax is imposed only when the nonresident heirs are also aliens. But it is argued by respondent, as the court below held, that the present tax is not prohibited by the Treaty since it is one upon succession, *In re Estate of Thompson,* 196 Iowa 721, *In re Meinert's Estate,* 204 Iowa 355, and not on property or its removal which, it is said, is alone forbidden; and that in any case since the only tax discrimination aimed at by Article 7 in cases of inheritance is that upon the power of disposal of the estate and not the privilege of succession, the particular discrimination complained of is not forbidden, for the statutes of Iowa permit a citizen of Denmark to dispose of his estate to citizens and residents of Denmark on the same terms as a citizen of Iowa to like non-resident alien beneficiaries.

The narrow and restricted interpretation of the Treaty contended for by respondent, while permissible and often necessary in construing two statutes of the same legislative body in order to give effect to both so far as is reasonably possible, is not consonant with the principles which are controlling in the interpretation of treaties. Treaties are to be liberally construed so as to effect the apparent intention of the parties. *Jordan* v. *Tashiro,* 278

U. S. 123; *Geofroy* v. *Riggs*, 133 U. S. 258, 271; *In re Ross*, 140 U. S. 453, 475; *Tucker* v. *Alexandroff*, 183 U. S. 424, 437. When a treaty provision fairly admits of two constructions, one restricting, the other enlarging rights which may be claimed under it, the more liberal interpretation is to be preferred, *Asakura* v. *Seattle*, 265 U. S. 332; *Tucker* v. *Alexandroff, supra; Geofroy* v. *Riggs, supra,* and as the treaty-making power is independent of and superior to the legislative power of the states, the meaning of treaty provisions so construed is not restricted by any necessity of avoiding possible conflict with state legislation and when so ascertained must prevail over inconsistent state enactments. See *Ware* v. *Hylton,* 3 Dall. 199; *Jordan* v. *Tashiro, supra;* cf. *Cheung Sum Shee* v. *Nagle,* 268 U. S. 336. When their meaning is uncertain, recourse may be had to the negotiations and diplomatic correspondence of the contracting parties relating to the subject matter and to their own practical construction of it. Cf. *In re Ross, supra,* at 467; *United States* v. *Texas,* 162 U. S. 1, 23; *Kinkead* v. *United States,* 150 U. S. 483, 486; *Terrace* v. *Thompson,* 263 U. S. 197, 223.

The history of Article 7 and references to its provisions in diplomatic exchanges between the United States and Denmark leave little doubt that its purpose was both to relieve the citizens of each country from onerous taxes upon their property within the other and to enable them to dispose of such property, paying only such duties as are exacted of the inhabitants of the place of its situs, as suggested by this Court in *Petersen* v. *Iowa, supra,* p. 174, and also to extend like protection to alien heirs of the non-citizen.

On March 5, 1824, Mr. Pedersen, Minister of Denmark to the United States, presented to John Quincy Adams, Secretary of State, a project of convention for the consideration of this Government. This project dealt with the commercial relations between the two countries and their

territories and the appointment of consular officers, but did not contain any provisions corresponding to Article 7. On January 14, 1826, certain citizens of the United States addressed to Henry Clay, then Secretary of State, a memorial complaining of certain taxes, imposed by the Danish Government with respect to property of citizens of the United States located in the Danish West Indies, known as "sixths" and "tenths," the former being one-sixth of the value of the property, payable to the crown, and the latter a further one-tenth of the residue, payable to the town or county magistrate, as a prerequisite to removal of property from the Islands. Both taxes were imposed on the property inherited by an alien heir. Danish Laws, Code of Christian V, Book V, c. 2, §§ 76, 77, 78, 79. The memorial prayed that an article be inserted in the treaty then contemplated with Denmark, comparable to the similar provisions of existing treaties between Denmark and Great Britain and Denmark and France, forbidding the imposition of taxes of this character.

Previously, on November 7, 1825, Mr. Clay had addressed a note to the Minister of Denmark, setting forth the conditions under which the United States would be disposed to proceed with negotiations. 3 Notes to Foreign Legations, 451. The note included, in numbered paragraphs, certain proposals which the government of the United States desired to have considered in connection with the draft convention submitted by the Danish Minister. Paragraph 5 was as follows:

"When citizens or subjects of the one party die in the country of the other, their estates shall not be subject to any *droit de détraction,* but shall pass to their successors, free from all duty."

In a letter of April 14, 1826, shortly before the execution of the Treaty, the Danish Minister transmitted to Mr. Clay a copy of what he termed "the additional Article to the late Convention between Denmark and Great

Britain respecting the mutual abolition of the *droit de détraction.*" This article, dated June 16, 1824, is substantially in the phraseology of Article 7 of the present treaty between the United States and Denmark.[1]

In the communication of Mr. Clay to the Danish Chargé d'Affaires of November·10th, 1826, following the ratification of the Treaty, referring to Article 7; he said: " The object which the government of the United States had in view in that stipulation, was to secure the right of .their citizens to bring their money and movable property home from the Danish islands, free from charges or duties and especially from the onerous law, known in those islands, under the denominations of sixths and tenths. This object was distinctly known to Mr. Pedersen, throughout the whole of the negotiation, and was expressly communicated by me to him in writing." In the reply of the following day, the Danish Chargé d'Affaires stated: " I have been authorized . . . to declare to you, that measures have been taken accordingly by the Danish Government, to secure the due execution of the 7th Article of the Convention, conformably to the intent and meaning thereof as by you stated. . . ."

The *droit de détraction,* referred to in the communication of Mr. Clay of November 7, 1825, and in the note of

---

[1] " Their Britannick and Danish Majesties mutually agree, that no higher or other Duties shall be levied, in either of Their Dominions . . . upon any personal property of Their respective Subjects, on the ·removal of the same from the Dominions·of Their said Majesties reciprocally, (either upon the inheritance of such property, or otherwise,) than are or shall be payable in each State,. upon the like property, when removed by a Subject of such State, respectively." 12 British and Foreign State Papers, 1824–1825 (1826) 49. Article 40 of the Treaty of Commerce and Navigation, concluded between France and Denmark August 23, 1742, provided that the citizens of each of the two countries reciprocally should be exempt in the other from the *droit d'aubaine* or other similar disability, under whatever name, and that their heirs should succeed to their property without impediment. 1 Coercq,·Recueil des Traités de la France (1864) 57.

the Danish Minister of April 14, 1826 in which he identified that phrase with the tax prohibited by the additional article of the treaty between Denmark and Great Britain of June 16, 1824, similar in terms to the article now before us, was a survival from medieval European law of a then well recognized form of tax, imposed with respect to the right of an alien heir to acquire or withdraw from the realm the property inherited.[2] Although often referred to as a tax on property or its withdrawal, the *droit de détraction* seems rather to have been a form of inheritance tax, but one which, because of its imposition only with respect to property of aliens who normally removed it from the realm, was sometimes associated with the re-

---

[2] The *droit de détraction* was derived from the *droit d'aubaine,* one of the many harsh feudal laws and customs directed against strangers and which, in its narrowest sense, was the right of the sovereign, as successor of the feudal lords, to appropriate all the property of a non-naturalized alien dying, either testate or intestate, within the realm. 1 Calvo, Dictionnaire de Droit International (1885) 67, Aubaine; 1 Merlin, Répertoire de Jurisprudence (5th Ed. 1827) 523, Aubaine; Halleck, International Law (1861) 155; 2 Ferriere, Oeuvres de Bacquet (1778) 8, *et seq.* This right was exercised to the exclusion of all heirs whether they were citizens or aliens or resided within or without the realm, with the single exception of resident legitimate offspring, and continued to be exercised long after aliens had been accorded unrestricted power of disposition of goods *inter vivos.* Demangeat, Historie de la Condition Civile des E'trangers en France (1844) 110, 125; Loisel, Institutes Contumiers, Liv. 1, règle 50. The term has, however, sometime' been applied to all the varying disabilities of aliens, Fiore, Le Droit International Privé (1907) 14, and more often used to include not only the inability of the alien to transmit but the complementary incapacity of an alien to inherit, even from a citizen. Merlin, *supra,* Aubaine.

But commercial expediency led, at an early date, to a mitigation of the rigors of the *droit d'aubaine.* This process took several forms, the exemption of alien merchants in certain trading centers, of certain classes of individuals (ex soldiers, etc.) and, most prominently, treaties providing for its reciprocal abandonment or contraction. In these treaties, the *droit de détraction* was recognized as a tax, of from

moval rather than the inheritance of the property. It was limited to inheritances, existed with and supplemented other taxes, the *droit de retraite* or the *droit de sortie,* imposed on the removal of property other than inheritances, Guyot, Répertoire de Jurisprudence (1785) Sortie; Calvo, Dictionnaire du Droit International (1885) Détraction; Oppenheim, International Law (4th ed., 1928) 559, and was, in most cases, applied regardless of the subsequent disposition of the property. Merlin, Répertoire de Jurisprudence (5th ed., 1827) Détraction; Guyot, *supra,* Détraction. Its origin and an examination of the commentators likewise leave no doubt that the *droit de détraction*—the tax—accrued upon the death of the decedent, and only after it had been collected was the heir entitled to take possession of the property and remove or otherwise dispose of it.[3] It was thus the

---

five to twenty, usually ten, per cent of the value, imposed on the right of an alien to acquire by inheritance (testate or intestate) the property of persons dying within the realm. Demangeat, *supra,* at 219, 225; 2 Massé, Le Droit Commercial (1844) 14; 1 Calvo, *supra,* Détraction; Fuzier-Herman, Répertoire Général Alphabétique du Droit Francaise (1890) Aubaine, 6; Guyot, Répertoire de Jurisprudence (1785) Détraction; Merlin, *supra,* Détraction. Oppenheim, International Law (4th Ed. 1928) 560; Halleck, *supra,* at 155; Wheaton, Elements of International Law (8th Ed. 1866) 138. The *droit d'aubaine* and the *droit de détraction* were abolished in France by decrees of the Assembly in 1790 and 1791, but subsequently reappeared in the Civil Code, Arts. 726, 912, with provision for abandonment as to a nation according similar treatment to French nationals. They were again abolished, with certain protective provisions for French heirs, by the Law of July 14, 1819. See Dalloz, Répertoire Pratique (1825) Succession; Demangeat, *supra,* at 239, *et seq;* and citations, *supra.*

[3] " C'est un droit par lequel le souverain distrait à son profit une certaine partie de succession qu'il permet aux étrangers de venir receueiller dans ses états." 4 Merlin, *supra,* 518, Détraction; Guyot, *supra,* Détraction. " Ce droit . . . consistait dans un prélèvement opéré par le gouverment . . . sur le produit net des successions transférés à l'étranger." Calvo, *supra,* Détraction; see also Fuzier-Herman, Répertoire Général du Droit Francaise (1890) Aubaine, 6.

precursor of the modern inheritance tax, differing from it in its essentials solely in that it was levied only where one of the parties to the inheritance was an alien or non-resident.[4]

That the present discriminatory tax is the substantial equivalent of the *droit de détraction* is not open to doubt. That it was the purpose of the high contracting parties to prohibit discriminatory taxes of this nature clearly appears from the diplomatic correspondence preceding and subsequent to the execution of the Treaty, although the " sixths and tenths " tax, with which the parties were immediately concerned, was a removal tax.

We think also that the language of Article 7, interpreted with that liberality demanded for treaty provisions, sufficiently expresses this purpose. It is true that the tax prohibited by the Treaty is in terms a tax on property or on its removal, but it is also true that the modern conception of an inheritance tax as a tax on the privilege of transmitting or succeeding to property of a decedent, rather than on the property itself, was probably unknown to the draftsmen of Article 7. But whatever, in point of present day legal theory, is the subject of the tax, it is the property transmitted which pays it, as the Iowa statute carefully provides.[5] In the face of the broad language embracing " charges, or taxes of any kind . . . upon any personal property . . . on the removal

---

[4] A number of early treaties of the United States clearly recognize this essential characteristic of the *droit de détraction,* either by providing in terms for the abolition of both removal duties and the *droit de détraction,* cf. Treaties with: France of 1778, 2 R. S. 203, 206; Wurttemberg of 1844, 2 R. S. 809; Saxony of 1845, 2 R. S. 690; or by words of similar import. Cf. Treaties with: France of 1853, 2 R. S. 249, 251; Switzerland of 1850, 2 R. S. 748, 749, 750; Honduras of 1864, 2 R. S. 426, 428; Great Britain of 1900, 31 Stat. 1939.

[5] " The tax shall be and remain a legal charge against and a lien upon such estate, and any and all the property thereof from the death of the decedent owner until paid." Iowa Code (1927) c. 351, § 7311. See also §§ 7309, 7363.

of the same . . . either upon the inheritance of such property . . . or otherwise," the omission, at that time, of words more specifically describing inheritance taxes as now defined, can hardly be deemed to evidence any intention not to include taxes theoretically levied upon the right to transmit or inherit, but which nevertheless were to be paid from the inheritance before it could be possessed or removed. Moreover, while it is true that the tax is levied whether the property is actually removed or not, it is, nevertheless, imposed only with respect to a class of persons who would normally find it necessary so to remove the property in order to enjoy it, and since payment of the tax is a prerequisite to removal, the tax is, in its practical operation, one on removal. In the light of the avowed purpose of the Treaty to forbid discriminatory taxes of this character, and its use of language historically deemed to embrace them, such effect should be given to its provisions.

The contention that the present discrimination is not one forbidden by the language of Article 7, since the decedent's power of disposal is the same as that of a citizen, leaves out of consideration both the nature of the tax contemplated by the contracting parties and the fact that the treaty provisions extend explicitly to the withdrawal of such property by the alien heir upon inheritance and, as already pointed out, protect him in his right to receive his inheritance undiminished by a tax which is not imposed upon citizens of the other contracting party.

*Reversed.*