**YONEJIRO NAKASUJI v. SEAGER, Collector of Customs, et al.**

No. 19.

District Court, S. D. California, Central Division.

March 30, 1933.

Keating & Bowen, of Los Angeles, Cal. (Theodore E. Bowen, of Los Angeles, Cal., of counsel), for plaintiff.

Frank M. Chichester, Asst. U. S. Atty., of Los Angeles, Cal., for the United States.

Samuel W. McNabb, U. S. Atty., of Los Angeles, Cal., for defendant.

COSGRAVE, District Judge.

The fishing boat Western Enterprise, Yonejiro Nakasuji, master and part owner,

on March 4, 1931, cleared from the port of San Pedro, Cal., for Ensenada, Mexico, proceeding in ballast. At Ensenada on March 5th the master signed on as additional members of his crew five Japanese aliens whose presence has given rise to this litigation. The boat then proceeded in ballast to San Pedro, arriving there on the morning of March 6th. The United States immigration inspector boarded the boat and questioned the bona fide status of the aliens signed on at Mexico the day before as seamen, with the result that he served notice on the master to detain them on board and to deport them from the United States. The boat remained in the port of San Pedro until March 15th, when it cleared for Mexican waters, carrying the five aliens whose detention and deportation had been ordered.

The boat proceeded to Magdalena Bay, Mexico, fishing, and about April 4th arrived at San Diego with a cargo of fish, but proceeded on to San Pedro. It remained in San Pedro until April 13th, when again it cleared for Mexican waters, fishing in the Magdalena Bay region. The vessel again arrived at San Diego about May 21st, where it delivered its cargo, but proceeded on to San Pedro, where it remained while certain repairs were being made to the engines, the aliens all the while aboard.

At San Pedro on June 10th the five aliens were again found aboard the boat by the immigration officer. The latter, finding that the boat had not been in a foreign port since her departure from San Pedro on March 6th when the order to detain on board and deport the aliens had been given, made application to the Secretary of Labor for warrant of arrest of the five aliens on the ground that they had remained in the United States for a longer time than permitted under the Immigration Act of 1924. On August 15th an order was made by the Secretary of Labor directing that, unless the master of the Western Enterprise agreed to effect the deportation of the aliens in a manner prescribed by law, they be deported on another vessel at the expense of the Western Enterprise. On August 24th the aliens shipped aboard the Western Enterprise to the port of Ensenada. This accomplished their deportation as required by the order of the Secretary of Labor, and the deportation matter apparently was closed.

On July 6, 1931, while the deportation proceedings were pending, notice of liability of fine was served on the master of the Western Enterprise because of his failure to detain on board and deport the Japanese as required by the order of March 6, 1931.

It appears, therefore, that the aliens in question did not at any time either land or seek permission to land. They were at all times detained on board the vessel by the master. Neither were they taken to any foreign port, for, as shown, the vessel proceeded to its fishing grounds adjacent to the coast of Mexico, but did not at any time enter any port.

The master retained counsel in his defense in the fine proceedings. Protest was duly made under departmental regulations, and the matter was heard before the Secretary of Labor in Washington. The master was found liable under provisions of section 20, paragraph a, of the Immigration Act of 1924 (8 USC § 167, 8 USCA § 167(a), and a fine of $5,000, being $1,000 for each of the aliens, was imposed against the vessel. This amount was deposited in order to give the vessel clearance, and the collector of customs was about to cover it into the Treasury of the United States when the bill in this case was filed.

■ Upon arrival of a vessel from any foreign port, the master must furnish a list of all aliens, together with certain information concerning the same. He must also report all cases where the alien has illegally landed together with other information, all of which is suggestive of the duty of complete surveillance by immigration officers of all persons on the vessel. Immigration Act of 1917, § 36 (8 USC § 171 [8 USCA § 171]).

By the provisions of section 31 of the Immigration Act of 1917 (8 USC § 165 [8 USCA § 165]) a master who knowingly signs on the ship's articles or brings to the United States as a member of his crew any alien with intent to permit the alien to land in the United States is penalized, and he subjects his vessel to a fine. Details for the enforcement of these provisions are provided in rule 7 of Immigration Rules of January 1, 1930. These provisions indicate an intention on the part of Congress that the immigration officer shall be supplied with full, detailed information as to all persons on the vessel as a basis for the exercise of this judgment respecting their admission, rejection, or other disposition.

The Immigration Act of 1924, § 20 (8 USC § 167 [8 USCA § 167]), contains the provision under which action was taken in this case. It is fair to presume that it was the intent of Congress that the immigration officer, having been furnished with complete

data respecting all on the vessel and having an opportunity to inspect them, within the limits of his discretion may decide that certain of the crew are not bona fide seamen and that their deportation is necessary.

The act provides (Immigration Act of 1924, § 20 [8 USC § 167, 8 USCA § 167]) that the "master of any vessel arriving in the United States from any place outside thereof who fails to detain on board any alien seaman employed on such vessel until the immigration officer in charge at the port of arrival has inspected such seaman * * * or who fails to detain such seaman on board after such inspection or to deport such seaman if required by such immigration officer or the Secretary of Labor to do so, shall pay to the collector of customs of the customs district in which the port of arrival is located the sum of $1,000 for each alien seaman in respect of whom such failure occurs."

■ It is urged on behalf of plaintiff that under this section the master may be required to detain the seamen on board after inspection or to deport the seamen, but that he cannot do both. The language of the act, however, is to the contrary.

It is plain that any one of three acts subjects the master to the fine: First, failure to detain the seamen until inspection; second, failure to detain them after inspection; third, failure to deport the seamen if required. The power of the immigration officer plainly is not exhausted when he orders one of the acts done. The master is liable on failure to perform any of the three. A considerable discretion should be possessed by the immigration officer, and he may find it necessary, in order to insure deportation, to require confinement of the alien to the vessel also. The language of the act clearly gives this power.

As shown, the aliens were not taken to any foreign port previous to the time that proceedings to levy the fine were instituted. They were, however, taken to the high seas and Mexican waters. The question arises whether this was deportation as contemplated by the act. The government contends that the aliens were not taken to any foreign port or place; that, since their return from the place to which they were taken would not constitute an entry into the United States, they were not deported; that deportation is not accomplished unless the alien is removed from the United States and taken to a definite port or place elsewhere, and claim authority for this position in Claussen v. Day, 279 U. S. 398, 49 S. Ct. 354, 73 L. Ed. 758.

The decision of Claussen v. Day, supra, turns upon the date of entry of the petitioner into the United States, and holds that the return of the seaman on an American vessel from a foreign port to the United States is an entry as contemplated by the immigration law. The decision quotes the definition of the United States as provided in the Immigration Act of 1924 (8 USC § 173 [8 USCA § 173]) as "The United States, and any waters, territory, or other place subject to the jurisdiction thereof, except the Isthmian Canal Zone," in answer to the contention of the petitioner that, because he was on an American vessel, though in foreign waters, he was still in the United States. "Such a vessel outside the United States whether on the high seas or in foreign waters is not a place included within the United States as defined by the act. * * * There is no such entry where one goes to sea on board an American vessel from a port of the United States and returns to the same or another port of this country without having been in any foreign port or place." Page 401 of 279 U. S., 49 S. Ct. 354, 73 L. Ed. 758. The government therefore contends that, since the return of the alien seamen to San Pedro was not an entry into the United States, they could not have been deported, because deportation involves removal from the United States to a foreign port or place.

United States v. Corsi, decided October 17, 1932, 287 U. S. 129, 53 S. Ct. 40, 42, 77 L. Ed. 215, turns upon what constitutes an entry into the United States under the Immigration Act of 1924. In that case the alien, domiciled in this country, signed as a member of the crew on a vessel of United States registry and made a voyage to Germany, where the vessel stayed two and one-half days. Whether or not the alien went ashore does not appear. On his return to the United States he was deemed to have entered. "He came from a place outside the United States, and from a foreign port or place, within the meaning of the immigration laws" —citing Claussen v. Day, supra. I am not convinced that either of the two cases cited is conclusive upon the question here. It must be remembered that these aliens neither landed nor sought permission to land at any time.

The term "deport" has not, except by inference, received a statutory definition in the Immigration Act. The United States Supreme Court, in passing upon the Chinese Exclusion Act and distinguishing between transportation, extradition, and deportation, uses language as follows: " 'Deportation' is

the removal of an alien out of the country simply because his presence is deemed inconsistent with the public welfare, and without any punishment being imposed or contemplated, either under the laws of the country out of which he is sent or under those of the country to which he is taken." Fong Yue Ting v. U. S., 149 U. S. 698, 13 S. Ct. 1016, 1020, 37 L. Ed. 905, 911.

Webster's New International Dictionary defines "deportation" as the removal from the country of an alien considered inimical to the public welfare. Bouvier adopts the definition laid down by the Supreme Court in Fong Yue Ting v. U. S., supra.

■ Boards of special inquiry have authority to determine whether an alien shall be allowed to land or shall be deported. Immigration Act of 1917, § 17 (8 USC § 153 [8 USCA § 153]). So far as my examination of the various acts has revealed, this is the only instance, with the exception of the one that is involved in the present case, under section 20 of the Immigration Act of 1924 (8 USCA § 167), where deportation is authorized by any authority except on warrant of arrest and order of the Secretary of Labor. The nearest approach to a statutory definition of the term is found in the Immigration Act of 1917, § 18 (8 USC § 154 [8 USCA § 154]), which provides that "all aliens brought to this country in violation of law shall be immediately sent back * * * to the country whence they respectively came, on the vessels bringing them, unless in the opinion of the Secretary of Labor immediate deportation is not practical or proper." By implication, therefore, the United States statutes define deportation as the return of the alien to the country whence he comes. Other provisions directing deportation mainly direct that it be done as provided in sections 19 and 20 of the Act of 1917 (8 USC §§ 155, 156 [8 USCA §§ 155, 156]), which contemplate deportation on order of the Secretary of Labor. By the provisions of section 20 of the act of 1917 (8 USC § 156 [8 USCA § 156]), deportation "provided for in this Act," at the option of the Secretary of Labor, shall be to the country from whence the alien comes or to the port at which he embarked. This method is restricted, except where adopted in the 1924 act, to deportation provided for in the act of 1917, and does not, so far as I can determine, include the deportation referred to in section 20 of the Act of 1924. The general clause in the act of 1924 covering deportation of aliens and directing that it be done as provided in sections 19 and 20 of the act of 1917 refers to aliens entering the United States and found at any time not entitled to enter. All orders of deportation under the provisions last referred to must be to a designated country. I have come to the conclusion that section 18 of the Act of 1917 (18 USC § 154 [18 USCA § 154]) governs deportation ordered in this case, since it seems by its language to be general.

■ The Immigration Act of 1924, § 20 (8 USC § 167 [8 USCA § 167]), contains no restriction upon the discretion of the immigration officer in charge at the port of arrival with respect to ordering the deportation of seamen whom he may deem to be other than bona fide seamen. In this case, as shown by the record, the vessel first is found at San Pedro on March 4th. It proceeded in ballast to Ensenada, a foreign port, there signed on the seamen who have given rise to the fine, and returned immediately in ballast to San Pedro. The officer boarded the vessel, and from his examination concluded that the five aliens were not bona fide seamen. This was a matter within his discretion. See opinion of Judge Ervin of the District Court in U. S. v. National Surety Co., 20 F.(2d) 972. There is no complaint that a fair hearing was not had. The master was represented by counsel at all stages, and considerable time was given to a review of the proceedings before the Secretary of Labor and Board of Review. It would have been an easy thing for the master of the vessel to have complied with the order of deportation. He did not do so, and after repeated visits the five seamen were found on the vessel in the same status as of March 6th, the date of the order. The section under examination relative to the power to levy fines has been discussed in several recent cases. Denholm Shipping Co., Ltd., v. Elting (D. C.) 55 F.(2d) 422; Lloyd Royal Belge Societe Annonyme v. Elting (D. C.) 55 F.(2d) 340; National Surety Co. v. Holtzman, 43 F.(2d) 544—Circuit Court of Appeals, Fourth Circuit.

■ The contention is made by plaintiff that the master did obey the order of deportation of the Secretary of Labor when on August 24th he transported the aliens on board his vessel to the port of Ensenada, and that he therefore actually complied with the order. To deem this a compliance with the order of the immigration officer would be to ignore entirely the actions of the master from March 6th to the time when the warrant of arrest was issued, and would recognize the right of the master to disregard entirely the order of

the immigration officer. His liability was fixed before the application was made to the Secretary of Labor for warrant of arrest.

■■ The statute is penal, and is to be construed strictly. Nevertheless, there is no escape from the conclusion that the master acted in deliberate disobedience of the order. The intention of Congress is plainly expressed, and the case is clearly within the provisions of the act, and the court is not at liberty to relieve the plaintiff of its oppressive consequences. U. S. v. Lacher, 134 U. S. 624, 10 S. Ct. 625, 33 L. Ed. 1080.

Judgment should therefore be for the government, and it is so ordered.