MUNSON STEAMSHIP LINE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 46601. Promulgated June 19, 1934.

*Edward L. Blackman, Esq.*, and *Frederick E. King, Esq.*, for the petitioner.

*James C. Maddox, Esq.*, for the respondent.

OPINION.

MURDOCK: The Commissioner determined a deficiency in income and excess profits taxes for the year 1920 in the amount of $182,-960.49. He made this determination upon the basis of a consolidated return filed by the petitioner for itself and certain subsidiary companies. This proceeding involves only the deficiency in excess profits tax in the amount of $178,930.52. The taxpayer companies filed an agreement with the Commissioner that the petitioner should be liable for all of the tax due. The question at issue before the Board is the amount of the deduction to which the petitioner is entitled under section 23 of the Merchant Marine Act, 1920, for the purpose of ascertaining its net income subject to excess profits tax.

The petitioner is a New York corporation which has been engaged for many years in the steamship and transportation business. It was so engaged in 1920. During the year it owned two vessels, the *Walter D. Munson* and the *Tuscan*, together with other property,

including other vessels, barges, lighters, terminal facilities, and an office building in New York City where it had its principal office and place of business. It also owned all of the outstanding capital stock of eight corporations hereinafter mentioned. The principal stockholders of the petitioner during 1920 were Frank C. Munson, his brother, and his father's estate. Some stock was also owned by officers and employees of the petitioner and by estates of former officers and employees.

The petitioner caused eight vessels to be built in American ship-yards during the period 1916 to 1918. It organized eight corporations during this period under the laws of New York. It sold and transferred to each corporation one of the eight vessels. The name of each vessel was the same as the first word of the name of the corporation to which it was sold. The cost of each vessel was carried on the petitioner's books as an investment until the time of sale. The purchase price of each vessel was paid to the petitioner either entirely, or principally, in stock of the purchaser at par; the balance, if any, was paid in cash or in promissory notes of the purchaser. The following table shows the name of each vessel, the name of the steamship corporation which owned it, the date each was incorporated, the amount of its capital stock outstanding in 1920, the cost of each vessel to the petitioner, the date of sale, and the amount of the purchase price:

| Name of vessel and steamship corporation | Date of incorporation | Capital stock outstanding in 1920 | Cost of vessel to petitioner | Date of sale | Purchase price |
|---|---|---|---|---|---|
| Munalbro | Sept. 1, 1916 | $300,000 | $450,000.00 | Sept. 6, 1916 | $450,000.00 |
| Munisla | Nov. 18, 1916 | 225,000 | 277,664.46 | Nov. 21, 1916 | 275,000.00 |
| Munplace | Nov. 18, 1916 | 300,000 | 396,741.49 | Nov. 21, 1916 | 400,000.00 |
| Munrio | Nov. 18, 1916 | 275,000 | 484,001.06 | Nov. 21, 1916 | 484,001.06 |
| Munsomo | Nov. 18, 1916 | 300,000 | 402,862.07 | Nov. 21, 1916 | 400,000.00 |
| Mundelta | June 6, 1917 | 565,000 | 563,942.46 | Aug. 28, 1917 | 565,000.00 |
| Munaires | Mar. 1, 1918 | 800,000 | 783,140.19 | Apr. 17, 1918 | 800,000.00 |
| Munindies | Mar. 1, 1918 | 700,000 | 688,077.61 | Apr. 17, 1918 | 700,000.00 |

Each of the aforesaid vessels was registered under the laws of the United States throughout 1920 in the name of its owner, with two exceptions. The *Munisla* was lost at sea in 1919 and the Munisla Steamship Corporation purchased another American vessel from the United States Shipping Board on March 27, 1920, to replace it. This latter vessel, also named *Munisla*, was registered at the time of purchase and delivery in the name of Munisla Steamship Corporation. The *Munindies* had been engaged in war service and was registered in the name of United States Shipping Board Emergency Fleet Corporation. It was returned to the Munindies Steamship Corporation in 1919, but its registration was not changed to the Munindies Steamship Corporation until August 25, 1920.

Frank C. Munson and John W. Reynolds have been, respectively, president and secretary of the petitioner and of each of the eight subsidiary corporations at all times material hereto. The petitioner and each of the eight companies had a board of directors of five members. Four individuals were directors in each of the companies. Each company had a fifth director who was an employee of the petitioner but was not a director of any of the other companies. The directors of the eight subsidiary companies received no salaries as such. They met in the office of the petitioner to declare dividends. These eight subsidiaries maintained no offices of their own and transacted no shipping business except through the petitioner. The subsidiaries owned no property other than the vessels above mentioned and certain balances due to them from the petitioner on account of the operation of these vessels.

The petitioner operated a fleet of vessels during 1920 which included the *Walter D. Munson* and the *Tuscan*, owned by it, and the eight vessels owned by the subsidiaries. Frank C. Munson directed the operation of this fleet and assigned the vessels to particular services according to their availability. In some instances the vessels of the subsidiaries were operated under formal written time-charter parties, signed by the petitioner and the subsidiary, by which a stipulated charter hire was payable by the petitioner as charterer and the operating expenses, including wages, fees, provisions, stores, insurance, and repairs, were to be borne by the subsidiary as owned. In some instances these vessels were operated by the petitioner without the execution of any written agreement. The petitioner advertised all of the vessels in the fleet, issued all bills of lading, and transacted the business under its own name. It attended to the hiring of the officers and crews, and paid their wages, contracted and paid for all repairs, paid all operating expenses of vessels in the fleet, and collected and received all revenue derived from the operation of the vessels. The earnings of each vessel were apportioned between the petitioner and the owner in amounts determined by Frank C. Munson. If a written charter had been entered into, the amount of the charter hire was credited to the account of the owner on the petitioner's books, and the account of the owner was charged with the amount of the operating expenses which it was required to pay under the terms of the charter. In those cases where no written agreement had been entered into, the petitioner credited to the account of the owner an amount which Frank C. Munson regarded as fair for the use of the vessel, being the amount which he estimated it would have earned in the trade, and the subsidiary was charged with an amount which Frank C. Munson considered proper as representing the operating expenses ordinarily borne by an owner. The balance due each owner in these accounts, on the books of the pe-

titioner, represented the earnings of that owner's vessel over and above the cost of operation, as determined by Frank C. Munson. When the directors of any of the subsidiary companies declared dividends, the petitioner deposited in the bank account of the company declaring the dividend a sufficient amount to enable the company to pay the dividend to the petitioner on the following day. These transactions were recorded on the books of the respective corporations. Total balances of approximately $3,000,000 were due to the subsidiaries from the petitioner throughout and at the close of 1920.

In 1920 the petitioner entered into a contract with the New York Shipbuilding Corporation of Camden, New Jersey, for the construction of a new ocean-going combination freight and passenger vessel named the *Munargo*. The vessel was completed in 1921, within the period of three years fixed by regulations of the United States Shipping Board relating to section 23 of the Merchant Marine Act, and was documented under the laws of the United States. The total cost of the vessel was $3,290,365, exclusive of furniture and fittings of the passenger department, and the funds for its construction were furnished by the petitioner. During 1920 the petitioner paid $675,-362.26 to the builder, and additional costs of $219,802.55 were incurred on the builder's charges during November and December 1920, which were payable in January 1921.

The United States Shipping Board adopted a resolution at a meeting on July 3, 1929, as follows:

Whereas, the Munson Steamship Line of New York having filed with this Board an application claiming benefits under Sec. 23 of the Merchant Marine Act, 1920, in aid of the steamship "Munargo", from which application and documents supplemental thereto it appears that applicant embodied these claims in its income tax returns for the year 1920, based on net income earned by it in 1920 from the operation of vessels in foreign trade, the tax on which has been computed by applicant to be about $225,000, the exemption of which, if allowed by the Treasury Department, is subject to a certification from this Board that a new vessel costing not less than $675,000 has been constructed in accord with the requirements of Section 23 of the Merchant Marine Act, 1920; and

Whereas, the Munson Steamship Line has, at a cost exceeding $1,000,000, duly built a new vessel named "Munargo" documented under the laws of the United States (Official No. 221839), built in an American shipyard, and completed within the time limit fixed under the rules and regulations relating to Sec. 23, Merchant Marine Act, 1920;

Resolved, that the vessel "Munargo" (Official No. 221839), a steel combination freight and passenger vessel, 413 ft. long, with a speed of about 15½ knots, is hereby approved both as to type and kind, and generally, for purposes incident to claims under Sec. 23, Merchant Marine Act, 1920, and as required by Article 5, Sec. 3 of the rules relating thereto. The facts set forth in the second preamble hereof are hereby certified to the Secretary of the Treasury as information. Whether the fund to which the tax involved relates arose from the

sources and under the circumstances prescribed by Sec. 23, Merchant Marine Act, 1920, and whether the amount claimed by applicant as exempt is in fact exempt, are not certified by this Board.

The net taxable earnings for 1920 of the eight subsidiary corporations above referred to amounted to $1,223,319.53, of which $1,187,-613.72 represented net earnings from charter hire of the eight vessels while operated in foreign trade during that year. The petitioner filed a consolidated income tax return for the year 1920 on behalf of itself and its subsidiary corporations, in which it claimed a deduction of $1,384,738.82 under section 23 of the Merchant Marine Act. The respondent disallowed $1,223,592.49 of this deduction and allowed $161,146.33 representing the difference between $185,034.30, the net earnings of the *Walter D. Munson* in foreign trade in 1920, and $23,887.97, the net loss of the *Tuscan* in foreign trade in 1920.

The petitioner contends that the deduction allowed by section 23 of the Merchant Marine Act, 1920,[1] for the purpose of ascertaining net income subject to the war profits and excess profits taxes imposed by Title III of the Revenue Act of 1918 includes the equivalent of the net earnings for 1920 from the operation in foreign trade of eight vessels owned by and registered in the name of eight of the petitioner's subsidiary corporations. The statement of facts contained in the foregoing paragraphs has been abridged from the stipulation of facts filed by the parties and supplemented by some facts found from the testimony. The parties are apparently agreed upon all of the important facts. Thus they seem to agree that: The petitioner was the owner in every sense of the word of the steamships *Walter D. Munson* and *Tuscan;* legal title to the steamships *Munalbro, Munisla, Munplace, Munrio, Munsomo, Mundelta, Munaires,* and *Munindies* was not held by the petitioner, but each of eight separate corporations held legal title to one of these vessels which it had bought and paid for; all 10 vessels were documented under the laws of the United States and were operated in foreign trade during the year 1920; the petitioner properly set aside and actually in-

[1] Sec. 23. That the owner of a vessel documented under the laws of the United States and operated in foreign trade shall, for each of the ten taxable years while so operated, beginning with the first taxable year ending after June 5, 1920, be allowed as a deduction for the purpose of ascertaining his net income subject to the war-profits and excess-profits taxes imposed by Title III of the Revenue Act of 1918 an amount equivalent to the net earnings of such vessel during such taxable year, determined in accordance with rules and regulations to be made by the board: *Provided,* That such owner shall not be entitled to such deduction unless during such taxable year he invested, or set aside under rules and regulations to be made by the board in a trust fund for investment, in the building in shipyards in the United States of new vessels of a type and kind approved by the board, an amount, to be determined by the Secretary of the Treasury and certified by him to the board, equivalent to the war-profits and excess-profits taxes that would have been payable by such owner on account of the net earnings of such vessels but for the deduction allowed under the provisions of this section: *Provided further,* That at least two-thirds of the cost of any vessel constructed under this paragraph shall be paid for out of the ordinary funds or capital of the person having such vessel constructed. * * * (June 5, 1920, c. 250, §23, 41 Stat. 997.)

vested in a new vessel, built in shipyards in the United States, of a type and kind approved by the Shipping Board, an amount in excess of the war profits and excess profits taxes that would have been payable for the whole group had section 23 of the Merchant Marine Act never been enacted; and two thirds of the cost of the vessel was paid for out of the ordinary funds or capital of the petitioner. Furthermore, the parties are in agreement as to the amount of the net earnings of each of these vessels from its operations in foreign trade in 1920. Thus the question presented to the Board is, Was the petitioner the " owner " of the steamships *Munalbro, Munisla, Munplace, Munrio, Munsomo, Mundelta, Munaires* and *Munindies* within the meaning of that term as used in section 23 of the Merchant Marine Act?

The petitioner argues that section 23 of the Merchant Marine Act is remedial legislation in the form of an amendment to the Revenue Act of 1918 which should be liberally construed in favor of the taxpayer; the regulations promulgated by the United States Shipping Board give to the word " owner " an interpretation which includes one having a beneficial interest in the property; all of the money risked in the business carried on by the subsidiary companies was risked by the petitioner; the petitioner exercised complete control over the vessels of its subsidiaries and in substance, although not in form, was the owner of the eight vessels in question within the meaning which Congress intended that word to have in section 23. The petitioner admits that, under a narrow or strict construction of the statute, it is not entitled to the deduction, since, in that sense, it was not the owner of the eight vessels which earned the income in foreign trade.

The United States Shipping Board was authorized and directed by section 19 of the Merchant Marine Act to make all necessary rules and regulations to carry out the provisions of the act. The rules and regulations adopted by the Board on June 28, 1922, relating to section 23, are in part as follows:

### ARTICLE 1.

#### WAIVER OF TAX ON NET EARNINGS.

1. *Scope of the Waiver:* The provisions relate to the war profits and excess profits taxes imposed by Title III of the Revenue Act of 1918; in effect, it is a waiver of such taxes on the net earnings from American vessels operated in foreign trade; and waiver resulting from an allowance, in proper cases, of the deduction of such net earnings for the purpose of ascertaining the owner's net income subject to such taxes.

2. *The Person Entitled:* The person entitled must be the owner of the vessel which yielded the "net earnings". The term "owner of a vessel" includes a person who has the real ownership of a vessel or of any portion thereof, whether or not encumbered. Where there are two or more owners, each of

them subject to the tax involved is entitled to the benefits allowed by this Section, in proportion to his share of the earnings; but persons owning shares in a corporation which own the vessel, have no right, for that reason to the deduction. "Net earnings" accruing to an owner from the charter of a vessel, to the extent it is operated in foreign trade through the period of the charter party, may receive the benefits of this Section.

Title III of the Revenue Act of 1918 imposed a tax, called war profits and excess profits tax, upon corporations only, and not upon individuals. Sec. 301 (a). Therefore, the word "person" in section 23 of the Merchant Marine Act and in the above quoted regulations can refer only to corporations. The regulation would then provide in part: " [Corporations] owning shares in a corporation which own[s] the vessel, have no right, for that reason to the deduction ". These regulations support the Commissioner's determination rather than the contention of the petitioner.

The word "owner" is an untechnical word (*Flink* v. *Paladini*, 279 U.S. 59), and has a variety of meanings. It is not defined in the Merchant Marine Act. Were we to assume that Congress intended it to have its ordinary and everyday meaning (*United States* v. *Kirby Lumber Co.*, 284 U.S. 1; *Welch* v. *Commissioner*, 63 Fed. (2d) 976), the word "owner" would not include one whose interest in the property arose through ownership of stock of a corporation which in turn owned the property. To "own" means "to possess; to have or hold as property, appurtenance, or proprium; to have rightful title to, whether legal or natural ", Webster, New Int. Dic.; " to hold as property; to have a legal or rightful title to; to have; to possess; and an 'owner' is one who owns; a rightful proprietor. An owner is not necessarily one owning a fee simple or one having in the property the highest estate it will admit of. One having a lesser estate may be an owner, and, indeed, there may be different estates in the same property vested in different persons, and each be an owner thereof ", *United States* v. *Ninety-nine Diamonds*, 139 Fed. 961. The word may refer not only to one holding the legal title, but also under some circumstances to one having only a beneficial interest in the property.

The petitioner states that it not only had the entire beneficial interest in the eight vessels in question, but it had possession and complete control over them. It argues that the word "owner" should be liberally construed to carry out the obvious purpose of the Merchant Marine Act, which was to encourage the development in this country of shipbuilding and a merchant marine. It argues as another reason for a liberal construction in its favor that the act was remedial and a taxing statute. But the act imposed no tax. On the contrary, it granted a deduction or an exemption, and there is a rule of construction that doubts in such statutes are to be resolved in favor of the Government and the deduction or exemption denied unless the

taxpayer comes squarely within the terms of the statute. *Swan & Finch Co.* v. *United States*, 190 U.S. 143, 146; *Cornell* v. *Coyne*, 192 U.S. 418; *Charles A. Collin*, 1 B.T.A. 305, 307. Thus, assuming but not deciding that the act was "remedial", there is, at best for the petitioner, a conflict of the rules of construction.

The meaning of a word as used at one place in a statute may be different from the meaning of the same word as used at another place in the same statute. *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U.S. 427. The intended meaning must be gathered from the connection in which the word is used. Frequently the obvious nature and purpose of a statute may indicate that the legislature intended a word to have some one of several possible meanings. *Hyde* v. *Shine*, 199 U.S. 62; *American Car & Foundry Co.* v. *Brassert*, 61 Fed. (2d) 162; *Warren* v. *Lower Salt Creek Dist.*, 316 Ill. 345; 147 N.E. 248. There is a general rule that a corporation is a separate legal entity which is the owner of its assets so that its stockholders can not assert separate ownership of, control over, or right to adverse possession of the property of the corporation. *De La Vergne Co.* v. *German Savings Inst.*, 175 U.S. 40; *Klein* v. *Board of Supervisors*, 282 U.S. 19, 24; *Wabash Ry.* v. *American Refrigerator Co.*, 7 Fed. (2d) 335; *Jones* v. *Commissioner*, 71 Fed. (2d) 214. Occasionally, however, courts have subordinated this rule temporarily and, for special purposes, have treated stockholders as the equitable owners of the property of a corporation. *Huron Portland Cement Co.* v. *Woodworth*, 19 Fed. (2d) 530; *Southern Pacific Co.* v. *Lowe*, 247 U.S. 330; *Gulf Oil Corp.* v. *Lewellyn*, 248 U.S. 71; *Berl* v. *Crutcher*, 60 Fed. (2d) 440; *The Cimbria*, 214 Fed. 131; *The Natchez*, 236 Fed. 588; *Paladini* v. *Flink*, 26 Fed. (2d) 21; affd., 279 U.S. 58; *The J. B. Austin, Jr.*, 1 Fed. (2d) 451; *Luckenbach S.S. Co.* v. *Grace & Co.*, 267 Fed. 676. But in each case the court found some important reason, peculiar to the particular situation presented and dominating the reason for the general rule, which required a departure from that rule. *United States* v. *Milwaukee Refrigerator Transit Co.*, 142 Fed. 247. These cases do not lay down any general rule of their own to be applied every time the word "owner" is used in a statute. *Burnet* v. *Commonwealth Improvement Co.*, 287 U.S. 415. Careful consideration of section 23 fails to disclose any relation between it and the statutory provisions involved in the cited cases sufficiently close, or any peculiar reasons applicable here so important, as to require a departure from the rule that a corporation is the owner of its property, and a stockholder, even a sole stockholder dominating and controlling the corporation, is not the owner of the property of the corporation. Cf. *New Colonial Ice Co.* v. *Commissioner*, 292 U.S. 435.

The encouragement which Congress intended to give shipping in section 23 was obviously limited to corporations. It was further limited to corporate owners of vessels and was also limited to corporate owners of vessels producing net earnings from foreign trade. Why these limitations were imposed is difficult to determine,[2] but they were imposed. The alleged hardship to this petitioner from the construction made by the Commissioner is no greater or more difficult to accept as intentional than others which are quite obvious under the act. In the present case the subsidiaries were the owners of the vessels, both legally and beneficially. They were entitled to the net earnings by reason of their ownership. They were taxable on these net earnings and the excess profits and war profits taxes were imposed upon them, despite their affiliation with the petitioner. *Woolford Realty Co.* v. *Rose*, 286 U.S. 319. It was only by agreement that the taxes imposed upon them were to be assessed against and paid by the petitioner on the basis of a consolidated return. Sec. 240, Revenue Act of 1928. The petitioner and each of the eight separate companies had net earnings from vessels engaged in foreign trade, but none of the eight companies set aside any amount for the building of a new ship. The petitioner alone set aside an amount for the building of a new vessel. The amount which it set aside was not only sufficient to offset the profits tax which it would have had to pay on its share of the net earnings of its vessels engaged in foreign trade, but was also sufficient to more than offset the profits tax imposed by each of the eight separate companies on account of the income of those companies from their vessels engaged in foreign trade. If each of the eight separate companies had complied with section 23, each would have been entitled to some deduction in computing its tax liability. But it does not follow that, because the petitioner set aside a sum larger than was necessary to entitle it to a deduction on account of its own earnings, it is entitled to a deduction in excess of its own earnings from vessels engaged in foreign trade and equal to the sum of the earnings of itself and the eight separate corporations from this source. Affiliation does not enlarge the taxpayer's right to this deduction. If Congress had intended the parent corporation of an affiliated group to have such a benefit, it would no doubt have made specific provision therefor. Cf. *United States* v. *Delaware & Hudson Co.*, 213 U.S. 366, 414. Where no such provision was made by the legislature, no other branch of the Government should supply the provision or interpret the act as if it contained such a provision.

The petitioner is contending for a deduction which will offset, *inter alia*, its own income and reduce its own tax liability, but which

---

[2] See for the purpose and legislative history of the act: Sec. 1, 41 Stat. 988; Sen. Rept. No. 573, 66th Cong., 2d sess., pp. 1–4; 59 Cong. Rec., pt. 7, pp. 7224, 7226, 7296; *American-Hawaiian S. S. Co.*, v. *United States*, 46 Fed. (2d) 592; H. Rept. 1093, 66 Cong., 2d sess., pp. 10, 11, and 32; 59 Cong. Rec., pt. 8, pp. 8408, 8500.

is based upon the income of a wholly different taxpayer. The petitioner deliberately created the separate corporations and deliberately sold and transferred the vessels to them. Dividends from these corporations were received tax free by the petitioner. The petitioner recognized that it did not own the vessels, in many instances executed formal time charters under which it operated the vessels, and in every instance paid for its use of the vessels. Whatever might have been the purpose of this arrangement, it was not a mere legal fiction and the ownership by the separate corporations was not fictitious. Cf. *Union Petroleum S.S. Co.* v. *Edwards*, 7 Fed. (2d) 301. The meaning of the word " owned " as used in section 23 is clear enough and no reason is apparent to enlarge this meaning to include a holding corporation such as the petitioner.

The petitioner raised another issue in the petition, namely, whether the deduction to which it is entitled under section 23 of the Merchant Marine Act, as owner of the vessels *Walter D. Munson* and *Tuscan*, is the equivalent of the net earnings of the *Walter D. Munson* without reducing those earnings by the corresponding net losses of the *Tuscan*, or whether it is limited to the equivalent of the net amount of the earnings of the two vessels from foreign trade in 1920, as determined by the Commissioner. The point has apparently been abandoned by the petitioner, for it was not even referred to at the hearing or in the petitioner's brief. The Commissioner contends that the manifest purpose of section 23 was to eliminate from income subject to profits tax only the net income derived by a taxpayer from the operation of its vessels in foreign trade. Under the circumstances we see no reason to disturb the Commissioner's determination in this regard.

Reviewed by the Board.

*Decision will be entered for the respondent.*

Smith dissents.