## MAKAH INDIAN TRIBE et al. v. McCAULY et al.

### No. 268.

District Court, W. D. Washington, N. D.

May 1, 1941.

Owen P. Hughes, of Tacoma, Wash., for plaintiffs.

G. W. Hamilton, Atty. Gen., and T. H. Little, Asst. Atty. Gen., for defendants.

Vanderveer, Bassett & Geisness, of Seattle, Wash., for plaintiffs.

Smith Troy, Atty. Gen., and T. H. Little, Asst. Atty. Gen., for defendants.

BOWEN, District Judge.

Motion for judgment on the pleadings which consist of the complaint and answer.

The complaint alleges among other things that plaintiff Indians by the Makah Indian Treaty of 1859, 12 Stat. 939, were secured in their right to fish at their usual and accustomed grounds and stations, including the Hoko River in the Olympic Peninsula of the State of Washington, but that the defendant state officers since 1933 have interfered with and prevented such rights by threatening to arrest plaintiff Indians and to confiscate their fishing gear, and that the defendants will, unless enjoined by this court, continue to so prevent plaintiffs from enjoying such fishing rights in the future, all in violation of such treaty.

By their answer defendants allege (1) that this court is without jurisdiction of the subject matter; (2) that the defendants are state officers, that their acts complained of are in pursuance of a state statute, that they are not the real parties in interest but that the real party in interest is the State of Washington (which it is argued by reason of the 11th Amendment cannot be sued in

*this action)*; (3) that plaintiff Indians are wards of the United States Government and have no capacity to sue except as such wards by the United States Attorney; and (4) that plaintiffs' complaint fails to state a cause of action upon which relief can be granted (under which issue defendants argue and plaintiffs deny that the Makah Indian Treaty is invalid as against the asserted authority of defendant state officers to enforce the state fishing laws, which are nowhere specially set up in the pleadings).

■ 1. This court has jurisdiction of the subject matter of this action because it involves plaintiffs' asserted rights under an Indian treaty with the United States of the alleged value of more than $3,000 exclusive of interest and costs, plaintiffs' allegations of such jurisdictional amount being admitted by defendants' answer.

■ 2. This is an action against state officers for relief against their acts alleged to be unlawful because in conflict with plaintiffs' fishing rights under the Makah Indian Treaty with the United States. "The action is not one in its essential nature and effect against the state to enforce a state liability, and so is not repugnant to the Eleventh Amendment" to the U. S. Constitution. Sampson v. Brennan, D.C., 39 F. Supp. 74, Memorandum Decision filed August 3, 1939. See, also, Pennoyer v. McConnaughy, 140 U.S. 1, 10, 11 S.Ct. 699, 35 L.Ed. 363; Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann.Cas. 764; Ex parte New York, 256 U.S. 490, 500, 41 S.Ct. 588, 65 L.Ed. 1057.

■ 3. "Plaintiff Indians being citizens of the United States (8 U.S.C.A., Sec. 3) may as other citizens employ counsel of their own choice. They may also in a federal court institute and prosecute an action to enforce their rights under the Constitution, laws or treaties of the United States." Sampson v. Brennan, supra. See, also, Deere v. New York, D.C., 22 F.2d 851; Y-Ta-Tah-Wah v. Rebock, C.C., 105 F. 257, 259; Lane v. Pueblo of Santa Rosa, 249 U. S. 110, 113, 114, 39 S.Ct. 185, 63 L.Ed. 504.

4. The final issue presented is whether the complaint states a cause of action upon which the requested relief can be granted. In the briefs and at the oral argument counsel have treated and the court will likewise treat this issue as raising the question of the validity of Article IV of the Makah Treaty providing that: "The right of taking fish and of whaling or sealing at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the United States, * * * together with the privilege of hunting and gathering roots and berries on open and unclaimed lands: Provided, however, That they shall not take shell-fish from any beds staked or cultivated by citizens."

Defendants emphasize that although the right to fish (the only right here in question) is by the treaty *"further secured"* to the Indians, such right is so secured only *"in common with all citizens"* of the United States, and therefrom defendants argue that just as are other citizens' fishing rights, so are such rights of the Indians, subject to all reasonable police power legislation and regulation by the state for the preservation and protection of fish and game, that such police power reserved to the people and exercised for them by the state is paramount to all conflicting treaty provisions, that the state fish and game laws are police measures which apply not only to the Indians but alike to all citizens, Indians and others, and that this conflicting treaty provision securing to the Indians their fishing rights must yield to such state police laws.

But does not that argument assume that the treaty *granted* instead of *"further secured"* to the Indians their fishing rights? Obviously such an assumption is contrary to the fact indisputably established by history and common knowledge. This nation by conquest and treaty acquired the land from the Indians, but before and after every conquest and conflict and after many a treaty the Indians asserted and enjoyed their ancient right to hunt and fish. That ancient right, of all the Indian rights of remotest antiquity, has by this nation and the Indians been regarded as the most sacred right of the Indians and has seldom ever been questioned. It is believed that, before the Stevens treaties of which the Makah Treaty is one, the Indians' right to fish in the domain now included in this state never was questioned by public authority or at all, and in this instance it is a most notable fact that subsequent to this treaty the right to fish "further secured" to the Indians by this treaty was unfailingly recognized and respected by all until the year 1933, a continuous period of about 75 years.

■ This court is of the opinion that as contended by plaintiffs the answer to this question as to the treaty's validity turns upon the sounder theory that the treaty *granted* nothing to the Indians, but that the

treaty in truth and in fact merely reserved and preserved inviolate to the Indians the fishing rights which from time immemorial they had always had and enjoyed. This conclusion is rendered inescapable by a fair consideration not only of Article IV, supra, but also of all the other provisions of the treaty. Nowhere in the treaty can be found a *conveyance* by the United States to the Indians of any property, except the money consideration to be paid by the Government for the lands and rights in the treaty conveyed by the Indians to the Government. In the treaty the United States is the sole grantee and the Indians exclusively are the grantors of all the property covered by the treaty, except that money consideration, and with that single exception the treaty *conveyed* no property to the Indians. Upon consideration of the conveyance by the Indians of their lands to the Government, the United States by Article IV, supra, solemnly recognized and guaranteed that "The right of taking fish * * *at usual and accustomed grounds and stations is further secured to said Indians* * * *" (emphasis supplied). So it is readily seen the treaty does not even purport to *grant* any fishing rights. It merely *"further secured"* to the Indians what fishing rights they already had, at their "usual and accustomed grounds and stations".

· That conclusion is further fortified by the following statements of the Indian chiefs and head men and of Governor Stevens when they negotiated this treaty in 1855: "Kalchote of Neah Bay said that he thought he ought to have the right to fish and take whale and get food where he liked. Keh-Tchook of the Stone House (Tatoosh Island) spoke next, saying that what Kalchote had said was his wish, that his country extended up to Hoke-Ho (Hoko River) and that he did not wish to leave the salt water. Governor Stevens then informed them that instead of wishing to stop their fisheries he wished to send them oil kettles and fishing apparatus. Klah-Prathoo of Neah Bay then replied that he was willing to sell his land; all he wanted was the right of fishing." (Affidavit of Charles E. Peterson et al. filed October 1, 1940).

And so by stating the foregoing objects and purposes of the treaty, the spokesmen for its High Contracting Parties construed it as a solemn declaration and guarantee reserving to the Indians for the treaty's duration, which those spokesmen undoubtedly then thought would be for all time to come,

the sacred fishing rights of the Indians already and from time immemorial enjoyed by them. How then can it be said that the treaty *granted* any Indian fishing rights? It did not. It merely *reserved* and guaranteed to the Indians those fishing rights which they always before had possessed and enjoyed.

That construction also leads to a denial of defendants' further contention that by the phrase "in common with all citizens of the United States" the treaty provision for the Indians' benefit was intended to be subject to future state police regulation of fish and game, because other citizens' fishing rights are subject to such police regulation. But it is far more probable that by that phrase the Indians merely indicated their willingness to share their pre-existing fishing rights with all citizens, and that the Indians were willing to continue to recognize other citizens' fishing rights then known to the Indians. There is no allegation or showing in this case that the Indians anticipated the possibility that in the future other citizens might have their fishing rights limited by the exercise of state police power or that other ctizens' fishing rights as the Indians knew them when the treaty was made might in any way be changed. Nor is there allegation or proof here that the Indians knew of or appreciated the present or possible future existence of any state sovereignty which might attempt to limit the fishing rights of either Indians or other citizens. The only sovereignty, other than their own tribal authority, whose power to regulate fishing was understood by the Makah Indians, very likely was our national government, to them the "Great White Father", with whom they were then negotiating a treaty to reserve and further secure to them their fishing rights at their "usual and accustomed" places.

This nation never acquired for its people by conquest, and did not by the Makah Treaty acquire, the pre-existing ancient Indian fishing rights on which the asserted police power could operate. The police power here invoked by defendants does not apply to subjects, such as Indian fishing rights, not possessed by the people, state or nation. The cases of People of State of New York ex rel. Kennedy v. Becker, 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed. 1166; and Ward v. Race Horse, 163 U.S. 504, 16 S. Ct. 1076, 41 L.Ed. 244, limiting or denying Indian treaty fishing rights, relied upon by defendants, are distinguishable upon the

ground either that the treaty provisions limited the Indians' reserved rights or that the Indians anticipated the future sovereign power to limit.

■ Those cases are distinguishable upon the further ground that the grant of citizenship to Indians by the Act of June 2, 1924, 8 U.S.C.A. § 3, enacted subsequent to decision of those cases, definitely withdrew the Indians' tribal and other property, such as fishing rights, from the operation of police power affecting the rights of other citizens. In effect, it was so held in Mason v. Sams, D.C.Wash., 5 F.2d 255, where Judge Cushman for the court, at pages 257 and 258, said:

"These Indian plaintiffs have been, by the Act of June 2, 1924 (43 Stat. at Large, 1923–1924, part 1, page 253, c. 233 [8 U.S.C.A. § 3]), made citizens of the United States, with this proviso:

" 'That the granting of such citizenship shall not in any manner impair or otherwise affect the right of any Indian to tribal or other property.'

"Under the rule favoring the Indians in the interpretation of treaties and laws affecting them, already alluded to, any fishing rights of plaintiffs under the treaty are preserved by this proviso."

■ This Makah Treaty should have applied to it in favor of the Indians the rule of Nielsen v. Johnson, 279 U.S. 47, 51, 52, 49 S.Ct. 223, 224, 73 L.Ed. 607, applicable to Indian and other treaties, that: "Treaties are to be liberally construed so as to effect the apparent intention of the parties. [Citing cases.] When a treaty provision fairly admits of two constructions, one restricting, the other enlarging rights which may be claimed under it, the more liberal interpretation is to be preferred, [Citing cases] and as the treaty-making power is independent of and superior to the legislative power of the states, the meaning of treaty provisions so construed is not restricted by any necessity of avoiding possible conflict with state legislation and when so ascertained must prevail over inconsistent state enactments. [Citing cases.] When their meaning is uncertain, recourse may be had to the negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter and to their own practical construction of it. [Citing cases.]"

■ And the Supreme Court has held that an Indian treaty should be liberally construed so as to give effect to the meaning attached to the treaty by the Indians themselves. So in Seufert Brothers Company v. United States, 249 U.S. 194, 198, 39 S.Ct. 203, 205, 63 L.Ed. 555, quoting in part from United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089, the court said: "We will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right without regard to technical rules.' (Choctaw Nation v. United States) 119 U.S. 1 (7 S.Ct. 75, 30 L.Ed. 306; Jones v. Meehan), 175 U.S. 1 (20 S.Ct. 1, 44 L.Ed. 491)."

No exception is made of state police power in the rule above quoted from Nielsen v. Johnson, supra, when the court said that "* * * as the treaty-making power is independent of and superior to the legislative power of the states, the meaning of treaty provisions so construed [i. e., liberally] is not restricted by any necessity of avoiding possible conflict with state legislation and when so ascertained must prevail over inconsistent state enactments".

■ The decision of this court upon the motion for judgment on the pleadings is that judgment should be entered for plaintiffs in accordance with the prayer of their complaint.

An order may be settled upon notice or stipulation.