Corazon **TABION**, Plaintiff,

v.

Faris **MUFTI** and Lana
**Mufti,** Defendants.

Civ. A. No. 94–1481–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 16, 1995.

Joseph J. Aronica, Edward N. Leavy, Edith R. Albert, Mudge Rose Guthrie Alexander & Ferdon, Washington, DC, John Connolly, Alexandria, VA, for plaintiff.

Earl F. Glock, Washington, DC, for defendants.

Helen F. Fahey, U.S. Atty., Richard Parker, Asst. U.S. Atty., Alexandria, VA, Frank W. Hunger, Asst. Atty. Gen., Vincent M. Garvey, Daphene R. McFerren, Dept. of Justice, Civ. Div., Jonathan B. Schwartz, Deputy Legal Adviser, Dept. of State, of counsel, Washington, DC, for the Government.

## MEMORANDUM OPINION

ELLIS, District Judge.

This case presents the important and (surprisingly) novel question concerning the extent to which a foreign diplomat and his spouse may rely on their diplomatic immunity to escape civil liability for debts incurred and laws violated in the United States.

### I.

Plaintiff Corazon Tabion, a Philippines national, left her country in 1989 and began working in Jordan as a domestic servant for Defendants Faris and Lana Mufti, a married couple. This employment arrangement continued until 1991, when the Muftis moved to the United States following Mr. Mufti's appointment to the position of First Secretary at the Embassy of Jordan in Washington, D.C.[1] Seeking to retain Tabion's services, the Muftis offered her a position as their domestic servant in the United States and, according to Tabion, promised her that she would receive the minimum wage plus overtime, as well as a reasonable work schedule in a comfortable environment. Tabion claims she relied on these representations and agreed to relocate to the United States and work for the Muftis in their new home in Virginia.

Tabion worked as a domestic servant for the Muftis in Virginia from August 28, 1991 to December 29, 1993. During this period, Tabion alleges that the Muftis required her to work 16 hour days at approximately $0.50 per hour, with no increased pay for overtime. In addition, Tabion claims the Muftis confiscated her passport and threatened her with dismissal, deportation, and arrest if she attempted to leave their household. Based on these allegations, Tabion filed suit against the Muftis, claiming that they violated the Fair Labor Standards Act, 29 U.S.C. §§ 201–09, by failing to pay her minimum wage plus overtime, breached her employment contract, engaged in intentional misrepresentations, falsely imprisoned her, and discriminated against her based on her race in violation of

---

1. Since that time, Mr. Mufti has been promoted. He currently serves as Counselor at the Embassy, and in the absence of the Jordanian Ambassador, Mr. Mufti fills in as the head of the Jordanian diplomatic mission to the United States with the title chargé d'Affaires *ad interim*.

42 U.S.C. §§ 1981, 1985(3). She seeks compensatory damages for past wages owed, as well as punitive damages and attorney's fees.

In response, the Muftis filed the instant motion to quash, claiming immunity from civil suit under the provisions of the Vienna Convention on Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227, T.I.A.S. 7502 ("Vienna Convention"), a treaty to which both Jordan and the United States are parties.[2] Under the Vienna Convention, diplomats and their household family members enjoy absolute immunity from criminal prosecution and, with three limited exceptions, immunity from civil suit as well. *See* Vienna Convention, Articles 31(1), 37(1). Tabion opposes the motion to quash, contending that this suit falls within one of the three exceptions to civil immunity, namely Article 31(1)(c). This article provides that a diplomatic agent shall *not* be immune from civil actions "relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." Tabion argues that her employment relationship with the Muftis constitutes just such a "commercial activity," and that the Muftis are subject to suit for disputes arising out of that relationship. For their part, the Muftis argue that Article 31(1)(c) must be read in conjunction with Article 42, which prohibits diplomats from engaging in professional or commercial activities for profit in the receiving State.[3] They contend that read in this light, the "commercial activity" to diplomatic immunity is quite narrow and does not encompass personal, non-business related debts incurred by a diplomat or his family. It is this dispute over the proper construction of Article 31(1)(c) that is currently at issue and central to this case.

## II.

■ Because the meaning of a treaty provision is at issue, a review of elementary principles of treaty construction is appropriate. Of course, it is important to recognize that treaties are contracts between foreign sovereigns. *De Geofroy v. Riggs,* 133 U.S. 258, 271, 10 S.Ct. 295, 298, 33 L.Ed. 642 (1890); 74 Am.Jur.2d *Treaties* § 4 (1974). As such, they must be construed in a manner designed to give effect to the intent of the signatories. *Id.* at § 26. And, to determine that intent, the proper starting point is, with treaties as with contracts, the text of the provision itself. *See, e.g., Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) (citations omitted); *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982) (citations omitted). Thus, the language of a treaty controls when it is clear, unambiguous, and consistent with the intent of the signatories. *United States v. Stuart,* 489 U.S. 353, 365–66, 109 S.Ct. 1183, 1190–91, 103 L.Ed.2d 388 (1989) (citations omitted); *Sumitomo,* 457 U.S. at 180, 102 S.Ct. at 2377 (citations omitted). But in light of the treaty's international nature, courts must be cautious to avoid a rote application of locally established meanings of phrases and words where such an application would lead to results inconsistent with the signatories' purpose. *De Geofroy,* 133 U.S. at 271, 10 S.Ct. at 298; 74 Am.Jur.2d *Treaties* § 33. And, because the signatories' intent is paramount, courts "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Air France v. Saks,* 470 U.S. 392, 397, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985) (quoting *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 677–78, 87 L.Ed. 877 (1943)). *Accord Eastern Airlines,* 499 U.S. at 535, 111 S.Ct. at 1493–94; 74 Am.Jur.2d *Treaties* § 32 (stating that in interpreting a treaty, courts should consult its history as well as the parties' negotiations and diplomatic correspondence).

■ Finally, it is a fundamental rule of treaty construction that their provisions be liberally construed, more so than private

---

**2.** Congress expressly incorporated the Vienna Convention into the Diplomatic Relations Act of 1978, 22 U.S.C. §§ 251–59, and, at the same time, repealed the former laws governing diplomatic immunity.

**3.** The full text of Article 42 reads: "[a] diplomatic agent shall not in the receiving State practice for personal profit any professional or commercial activity."

agreements. *See, e.g., Eastern Airlines,* 499 U.S. at 535, 111 S.Ct. at 1493–94 (citations omitted); *Saks,* 470 U.S. at 397, 105 S.Ct. at 1341 (citation omitted); *Choctaw,* 318 U.S. at 431–32, 63 S.Ct. at 677–78; 74 Am.Jur.2d *Treaties* § 24. Thus, "[w]hen a treaty provision fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred." *Nielsen v. Johnson,* 279 U.S. 47, 52, 49 S.Ct. 223, 224, 73 L.Ed. 607 (1929) (citing *Asakura v. Seattle,* 265 U.S. 332, 44 S.Ct. 515, 68 L.Ed. 1041 (1924); *Tucker v. Alexandroff,* 183 U.S. 424, 22 S.Ct. 195, 46 L.Ed. 264 (1902); *De Geofroy,* 133 U.S. at 271, 10 S.Ct. at 298). *Accord United States v. Stuart,* 489 U.S. 353, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989). *See also* 74 Am.Jur.2d *Treaties* § 24.

### III.

In light of these principles of treaty construction, analysis here properly begins with the language of the treaty provision in question. Article 31 of the Vienna Convention provides, in relevant part, as follows:

> 1. A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:

> . . . . .

> (c) an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.

At issue is the proper meaning and scope of the phrase "commercial activity". Nowhere does the Vienna Convention define "commercial activity", nor is there any published judicial opinion in the United States interpreting the phrase.

 But not to worry, Tabion notes, because the phrase clearly and unambiguously refers to all activities of a commercial nature, including personal contracts for goods and services. Not only do the words themselves convey this meaning, she argues, but an analogous body of law under the Foreign Sovereign Immunities Act ("FSIA") supports this interpretation as well. Unlike Article 31(1)(c) of the Vienna Convention, the "commercial activities" [4] exception to sovereign immunity under the FSIA has been the subject of extensive judicial review and interpretation. As a result, it is now clear that under the "commercial activities" exception to the FSIA, a foreign state is not immune from suit for debts relating to "private acts performed as a market participant," *Eckert Int'l. v. Government of Republic of Fiji,* 834 F.Supp. 167, 170 (E.D.Va.1993), *aff'd,* 32 F.3d 77 (4th Cir.1994), including an employment contract such as the one here at issue. *See Brewer v. Socialist People's Republic of Iraq,* 890 F.2d 97, 101 (8th Cir.1989).[5] The settled meaning of "commercial activities" in the FSIA, Tabion contends, controls the meaning of "commercial activity" in Article 31(1)(c). Thus, she argues, the plain and unambiguous terms of the Vienna Convention, coupled with the analogous FSIA case law, compel the conclusion that the Muftis are not immune from suit in this instance, and the analysis need proceed no further.

Tabion's argument is appealing. The prospect of borrowing from a well-established and settled body of law in construing Article 31(1)(c) is inviting. Not only would it permit parties who contract with diplomats to recover the benefits of their bargains and to enforce certain protective labor laws, but it would also bestow an intuitively appealing consistency to sovereign and diplomatic immunity. Yet, however enticing it is to equate similar phrases in the Vienna Convention and the FSIA, to do so in disregard of the Vienna Convention signatories' clear, contrary intent would be error and would exceed the proper bounds of judicial authority.

**4.** Although the phrase appears in its plural form in the FSIA and in the singular in the Vienna Convention, this difference is of no substantive consequence.

**5.** It is important to note that the legislative history of the FSIA provides specific examples of what Congress intended by "commercial activi-

ties", including "a foreign government's sale of a service or product, its leasing of property, its borrowing of money, its employment or engagement of laborers...." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615.

■ Contrary to Tabion's contentions, there are important differences between the FSIA and the Vienna Convention that preclude equating phrases in the two enactments. First, the FSIA is a statute enacted by the legislative bodies of the United States, while the Vienna Convention is a treaty among foreign sovereigns. While it may be reasonable to assume that Congress intends like phrases to carry like meanings in the legislation it enacts, courts cannot assume that foreign nations attach the same significance to these phrases. Tabion's protests to the contrary notwithstanding, the rule that courts should interpret similar language in related *statutes* alike [6] simply does not pertain here; the FSIA and the Vienna Convention are not related statutes. Second, the Vienna Convention was finalized in 1961, some 15 years before enactment of the FSIA. Thus, the drafters of the Vienna Convention employed the phrase "commercial activity" completely unaware of the definition it would subsequently receive in the FSIA.[7] Finally, and most importantly, even a cursory review of the discussions surrounding the adoption of Article 31(1)(c) reveals that the signatories to the Vienna Convention meant something quite different from what the drafters of the FSIA meant by the phrase "commercial activity". *See infra* § IV.

Thus, the meaning of "commercial activity" in Article 31(1)(c) of the Vienna convention cannot be determined simply by referring to the case law interpreting the FSIA's "commercial activities" exception. Nor is the phrase in the Vienna Convention so clear and unambiguous on its face as to admit of only one interpretation. It follows, therefore, that the quest for the meaning of the phrase calls for an inquiry into the negotiating and drafting history of the treaty.

### IV.

The Vienna Convention, like most treaties, had a lengthy gestation period. Conceived in 1952, it was not open for signature until 1961, and was not thereafter ratified in the United States until 1972. In 1952, the United Nations General Assembly ("General Assembly") requested the International Law Commission ("Commission") to undertake the codification of international law on "diplomatic intercourse and immunities." G.A.Res. 685, U.N. GAOR, 8th Sess., Supp. No. 9, at ¶ 170, U.N.Doc. A/2456 (1952), *cited in Report of the Commission to the General Assembly*, [1958] 2 Y.B. Int'l L. Comm'n 89, U.N.Doc. A/CN.4/SER.A/1958 (hereinafter *"1958 Commission Report"*). Pursuant to this request, the Commission appointed Mr. A.E.F. Sandström to the position of "Special Rapporteur" in 1954 and commissioned him to prepare a report on the subject. U.N. GAOR, 9th Sess., Supp. No. 9, at ¶ 73, U.N.Doc. A/2693 (1954), *cited in 1958 Commission Report* at 89, ¶ 46. The report, U.N.Doc. A/CN.4/91, was completed and submitted to the Commission for consideration in 1957. On the basis of this report, the Commission adopted a provisional set of draft articles with commentary following the proposed text. U.N. GAOR, 12th Sess., Supp. No. 9, at ¶ 16, U.N.Doc. A/3623 (1957), *cited in 1958 Commission Report* at 89, ¶ 47. The Commission then solicited comments on the draft from all member nations of the General Assembly. *See* 1958 Commission Report at 89, ¶ 48. It received comments from 21 responding nations, which the Commission reviewed along with the conclusions drawn by the Special Rapporteur. It then made changes to the provisional draft and in 1958, submitted a final draft to the General Assembly, with a recommendation that the treaty be forwarded to the member nations for adoption. *1958 Commission Report* at 89, ¶¶ 49–50. In 1961, the United National Conference on Diplomatic Intercourse and

---

**6.** *See* 2B N. Singer, *Sutherland Statutory Construction* § 53.03 (5th ed. 1992).

**7.** Indeed, sovereign immunity under the FSIA is explicitly "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act." 28 U.S.C. § 1604. *See also Liberian Eastern Timber Corp. v. Republic of Liberia*, 659 F.Supp. 606, 608 n. 3

(D.D.C.1987) (stating that "Congress did not intend the FSIA to affect diplomatic immunity under the Vienna Convention"); *Lafontant v. Aristide*, 844 F.Supp. 128, 137 (E.D.N.Y.1994) (FSIA enacted primarily to allow State-owned companies to be sued in United States and left "traditional head-of-state and diplomatic immunities untouched").

Immunities convened in Vienna, made further revisions to the draft, and adopted the Vienna Convention for ratification by the member nations. *United Nations Conference on Diplomatic Intercourse and Immunities: Summary Records of Plenary Meetings and of Meetings of the Committee of the Whole*, 1 U.N. GAOR, U.N.Doc. A. CONF.20/14 (1962). Forty countries signed the treaty in that year. *See* Leslie S. Farhangi, Note, *Insuring Against Abuse of Diplomatic Immunity*, 38 Stan.L.Rev. 1517, 1519 (1986). Since that time, the number of countries that have become party to the Vienna Convention has increased to over 150. *See* Geofferey R. Watson, *The Death of Treaty*, 55 Ohio St.L.J. 781, 819 (1994).

Records reflecting the negotiations that took place during the drafting process provide valuable insight into the intended meaning of Article 31(1)(c).[8] The substance of Article 31(1)(c) did not appear in the Commission's initial draft of the treaty, but was subsequently introduced by Mr. Verdross, a Commission member, as an amendment. *Summary Records of the Ninth Session*, [1957] 1 Y.B.Int'l L.Comm'n 97, U.N.Doc. A/CN.4/SER.A/1957. And, at its inception, the amendment did not include the word "commercial"; instead it simply read:

> Immunity from jurisdiction may not be invoked by a diplomatic agent for acts relating to a professional activity outside his official duties.

*Id.* Upon introduction of the amendment in this form, one Commission member, Mr. Francois, criticized the provision as unnecessary given the general prohibition against diplomats engaging in professional and business activities.[9] *Id.* The Special Rapporteur expressed essentially the same view, noting that "the whole idea of a diplomatic agent engaging in any professional activity outside his official duties [is] repugnant." *Id.* at 98. And indeed, the Commission as a whole joined this chorus, acknowledging that the "cases to which the amendment related were comparatively rare." *Id.* at 97. In sum, there was apparently something of a consensus that the amendment was redundant and unnecessary since diplomats already were barred from pursuing such activities. Nonetheless, not willing to foreclose that such situations "might arise," the Commission voted to adopt the amendment into the provisional draft. *Id.* Before doing so, however, the Commission inserted the word "commercial" at the request of Mr. El–Erian, but with little contemporaneous discussion of its significance. *Id.* at 97–98. This early portion of the drafting history suggests that from the beginning, the Commission viewed Article 31(1)(c) as pertaining not to diplomats' personal contracts for goods and services, which are certainly neither rare nor forbidden, but rather to business transactions for profit, which are both.[10]

Subsequent comments by member nations responding to the draft articles confirm that the Commission did not intend to deprive diplomats of immunity for commercial transactions that are unrelated to the pursuit of a business or trade, but that are merely incidental to day-to-day life. These member nations' reactions to Article 31(1)(c), with the "commercial activity" language inserted, were similar to the views expressed earlier by members of the Commission. Given the general prohibition against diplomats engaging in entrepreneurial activities, the government of Chile noted that "[t]he situation contemplated in [Article 31(1)(c)] appears very unusual." *Diplomatic Intercourse & Immunities: Summary of Observations Received from Governments & Conclusions of the Special Rapporteur*, U.N.Doc. A/CN.4/116, at 57

---

8. The numerical designation of this provision changed during the course of the drafting process. To avoid confusion, however, this Memorandum Opinion refers only to the provision's final designation as Article 31(1)(c).

9. This prohibition is reflected in Article 42 of the Vienna Convention. *See supra* note 3.

10. Tabion correctly points out that these statements doubting the necessity of the provision were made before the insertion of the word "commercial", which occurred near the end of the meeting. Nevertheless, given the absence of recorded debate over the added "commercial" language during this meeting, it appears likely that its introduction was not intended to alter significantly the context and meaning of Article 31(1)(c). Subsequent negotiations confirm this point as well. *See infra*.

(1958). Significantly, when the government of Australia requested a definition of "commercial activity," the Special Rapporteur replied that "the use of the words 'commercial activity' as part of the phrase 'a professional or commercial activity' indicates that it is not a single act of commerce which is meant, by [sic] a continuous activity." *Id.* at 56. Quite apparently, none of the Commission members or responding governments viewed the provision as depriving diplomats of immunity for everyday commercial transactions, such as shopping and having shoes repaired. Similarly, the commentary following the Commission's final draft of the treaty notes:

> The third exception arises in the case of proceedings relating to a professional or commercial activity exercised by the diplomatic agent outside his official functions. It was urged that activities of these kinds are normally *wholly inconsistent* with the position of a diplomatic agent, and that one possible consequence of his engaging in them might be that he would be declared *persona non grata.* Nevertheless, such cases may occur and should be provided for, and if they do occur the persons with whom the diplomatic agent has had commercial or professional relations cannot be deprived of their ordinary remedies.

*Report of the Commission to the General Assembly,* [1958] 2 Y.B.Int'l L.Comm'n 98, U.N.Doc. A/CN.4/SER.A/1958 (first instance of emphasis added). In other words, even after the addition of the word "commercial", the Commission viewed the activities described in Article 31(1)(c) as "inconsistent" with diplomatic duties and therefore unlikely to arise.

Records from the United National Conference on Diplomatic Intercourse and Immunities' convention in Vienna similarly reflect continued doubt as to the necessity of Article 31(1)(c). During the Conference, both Columbia and Italy proposed eliminating Article 31(1)(c) altogether in light of the prohibition against professional and commercial activities embodied in Article 42. Yet, recognizing the possibility that a diplomat might ignore

Article 42, as well as the fact that a diplomat's household family members are not similarly restricted by that provision, the Conference voted to retain Article 31(1)(c). *See United Nations Conference on Diplomatic Intercourse & Immunities: Official Records,* Vol. I at 212–13, U.N.Doc. A. CONF.20/14 (1962).

At all stages, the treaty's drafting and negotiating history points persuasively to the conclusion that Article 31(1)(c) was not intended to carve out a broad exception to diplomatic immunity for a diplomat's daily contractual transactions for personal goods and services. Activities such as purchasing a car, sending clothing to a tailor, and hiring a domestic servant certainly are not "wholly inconsistent" with a diplomat's functions. Nor are such activities particularly "unusual" or prohibited by Article 42. Yet those involved in the drafting process consistently questioned the need to provide an immunity exemption for commercial activities when diplomats were already barred from those activities. Thus, it is evident that the phrase "commercial activity" in the Vienna Convention means a business or trade activity for profit, and that Article 31(1)(c) was intended to reach those rare instances where a diplomatic agent ignores the restraints of his office and, contrary to Article 42, engages in such activity in the receiving State.[11] Accordingly, a diplomat who strays from his diplomatic functions and runs a car business or becomes a tailor in the receiving State cannot then shelter himself behind diplomatic immunity when disputes arise out of that activity. Not only is this broader construction of immunity clearly consistent with the drafters' intent, but it also follows the fundamental principle that treaties should be liberally construed so as to enlarge, rather than restrict, rights that signatory nations may claim under them. *See Nielsen,* 279 U.S. at 52, 49 S.Ct. at 224.

### V.

■ Beyond the negotiating history of the Vienna Convention, the view of the United

---

11. Or, as may be more common, the provision also reaches instances where a diplomat's family member engages in such activity.

States Department of State ("State Department") provides further support for this interpretation of Article 31(1)(c). Although not binding on courts, "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo,* 457 U.S. at 184–85, 102 S.Ct. at 2379–80 (citing *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961)); *see also* 74 Am.Jur.2d *Treaties* § 25. In light of this principle, the Court invited the State Department to submit a legal memorandum discussing its position on the proper construction of Article 31(1)(c). The State Department accepted this invitation and made clear its view that "the term 'commercial activity' as used in Article 31(1)(c) focuses on the pursuit of trade or business activity." (Statement of Interest of the United States at 4). Relying extensively on the Vienna Convention's negotiating history, the State Department concluded that the phrase does not include "contractual relationships for goods and services incidental to the daily life of the diplomat," *id.,* and therefore would not deprive the Muftis of immunity in the circumstances of this case. While the negotiating history alone provides sufficient evidence of the Muftis' immunity in this instance, the State Department's view is significant and adds substantial force to this conclusion.[12]

Finally, it is worth noting that commentators, too, have reached the same conclusion. Scholars and practitioners who have subsequently written articles and treatises on the Vienna Convention uniformly agree that Article 31(1)(c) was meant to complement Article 42 and, as such, does not encompass ordinary contracts for personal goods and services. *See, e.g.,* Eileen Denza, *Diplomatic Law: Commentary on the Vienna Conven-*

*tion on Diplomatic Relations* 166 (1976) (stating that "[a]lthough the provision is drafted in unnecessarily wide terms it is not intended to cover commercial contracts incidental to the ordinary conduct of life in the receiving State"); B. Sen, *A Diplomat's Handbook of International Law and Practice* 144 (3d ed. 1988) (explaining that there is no exception to diplomatic immunity under the Vienna Convention for non-payment of debts such as rent); *Satow's Guide to Diplomatic Practice* 126 (Lord Gore–Booth ed. 5th ed. 1978) (stating that Article 31(1)(c) pertains to those instances where a diplomat engages in professional or commercial activities in disregard of Article 42 or where a family member, who is not bound by Article 42 but enjoys similar immunity, engages in such activities).

■ In sum, records of the treaty's drafting and negotiating history, the position taken by the State Department, and the views of various commentators make it abundantly clear that Article 31(1)(c) was not intended to divest diplomats and their family of immunity for disputes arising out of personal contracts for goods and services that are incidental to daily life in the receiving State. Because the Mufti's relationship with Tabion falls into this category, and is not a "commercial activity" as envisioned by the drafters of, and signatories to, the Vienna Convention, the Muftis are immune from suit. The motion to quash must accordingly be granted.

## VI.

At first blush, the result in this case may strike many as unjust and contrary to common notions of fairness. In response, a few points are worth emphasizing. First, diplomatic immunity is a valuable and integral feature of our relations with foreign nations.

12. The State Department's current position is consistent with statements it made before various Congressional subcommittees during hearings on diplomatic privileges and immunities in 1988. For instance, in a written response to one question pertaining to the scope of Article 31(1)(c), the State Department wrote:

This exception, however, does not extend to all debts of diplomatic personnel. "The ideas of remuneration and of a *continuous* activity are central to the purpose of Article 31(1)(c)....

[I]t is not intended to cover commercial contracts incidental to the ordinary conduct of life in the receiving state."
*The Diplomatic Privileges and Immunities Act: Hearings on H.R. 3036 Before the Subcomm. on Internat'l Operations of the Comm. on Foreign Affairs,* 100th Cong., 2d Sess. 268–69 (1988) (quoting from Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 166 (1976)).

To protect United States diplomats from criminal and civil prosecution in foreign lands with differing cultural and legal norms as well as fluctuating political climates, the United States has bargained to offer that same protection to diplomats visiting this country. Because not all countries provide the level of due process to which United States citizens have become accustomed, and because diplomats are particularly vulnerable to exploitation for political purposes, immunity for American diplomats abroad is essential. And, understandably, reciprocity is the price paid for that immunity. Second, a certain amount of unfairness is inherent in the concept of diplomatic immunity. A diplomat may commit a serious and violent crime, yet it is undisputed that he or she would thereafter be absolutely immune from prosecution in this country. Viewed in this light, the result in this case is neither extreme nor aberrational.

Finally, the image of an unruly diplomat ignoring his debts and flouting the law without constraint is a popular hyperbole with little relation to reality. The fact that Tabion lacks a *judicial* remedy does not mean that she is left with no remedy at all. The Vienna Convention makes clear that despite their immunity, diplomats are under an obligation to follow the laws of the receiving State. *See* Vienna Convention, Article 41.[13] While this obligation cannot ordinarily be judicially enforced, the receiving State is not without the means, both formal and informal, of obtaining compliance. As an informal measure, the State Department can, and often does, investigate complaints of a diplomat's bad debts or broken contracts and, if warranted, mediate the dispute through the diplomat's embassy.[14] In many instances, simply bringing the matter to the attention of the embassy may sufficiently embarrass a delinquent diplomat into voluntary compliance. Where such informal tactics are unsuccessful, and the violation sufficiently extreme, the State Department may resort to more structured and formal remedies. One such remedy is to declare the diplomat *persona non grata* under Article 9(1)[15] of the Vienna Convention and, if appropriate, expel him or her from the United States. If the embassy is viewed as facilitating or endorsing the conduct, the State Department may then refuse to accept additional diplomats from that country. *See The Diplomatic Privileges and Immunities Act: Hearings on H.R. 3036 Before the Subcomm. on Internat'l Operations of the Comm. on Foreign Affairs*, 100th Cong., 2d Sess. 50 (1988). Cessation or reduction of foreign aid is another means by which this country can forcefully express its disapproval of the lawless behavior of a country's diplomats. Should this occur, it is reasonable to expect that the penalized country would take steps to ensure that its diplomats behave lawfully.

Beyond this, individuals who contract with diplomats do not lack means of protecting themselves from the possible consequences of diplomatic immunity. Among the precautionary measures merchants and providers of services may take are requiring cash pay-

13. Article 41 provides, in relevant part, as follows: "Without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving State."

14. The Hon. Selwa Roosevelt, former Chief of Protocol for the State Department, explained this practice at a Congressional hearing on diplomatic privileges and immunities. When asked specifically about the remedies available for diplomats' bad debts, she responded:

I go right to the ambassador when a case is brought to our attention.... So, there is a certain mediation involved, and that is what we would like to offer and try to offer—our good offices. And we often are successful in resolving disputes. But when we are not, then I ask the ambassador to come in and visit with me. We talk about it a bit, and I make it clear that I feel very strongly about it. Sometimes this is sufficient to get action, and sometimes it's not.

*The Diplomatic Privileges and Immunities Act: Hearings on H.R. 3036 Before the Subcomm. on Internat'l Operations of the Comm. on Foreign Affairs*, 100th Cong., 2d Sess. 50 (1988).

15. Article 9(1) reads, in relevant part: "The receiving State may at any time and without having to explain its decision, notify the sending State that the head of the mission or any member or the diplomatic staff of the mission is persona non grata or that any other member of the staff of the mission is not acceptable. In any such case, the sending State shall, as appropriate, either recall the person concerned or terminate his functions with the mission."

ments in advance and charging higher prices in exchange for the risk of non-payment. In short, although the alternatives to civil suit are imperfect, diplomatic immunity does not provide an unconstrained license to violate contracts and United States laws.

An appropriate order will issue.