# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2004

(Argued: June 13, 2005

Decided: September 7, 2005
Errata Filed: October 5, 2005)

Docket No. 04-2137-cv

AVERO BELGUIM INSURANCE, formerly known as
Royal & Sun Alliance Insurance,

*Plaintiff-Appellant*,

v.

AMERICAN AIRLINES, INC.,

*Defendant-Appellee*,

ALL FREIGHT CO-ordinators, N.V.

*Defendant*.

Before: CABRANES and RAGGI, *Circuit Judges*, and SAND, *District Judge*.[*]

Plaintiff appeals from the judgment of the United States District Court for the Southern District of New York (Robert W. Sweet, *Judge*), denying plaintiff's motion for partial summary judgment based on the District Court's finding that, on March 9, 2001, the United States was a party to The Hague Protocol of 1955 by virtue of its ratification of Montreal Protocol No. 4 in 1998.

REVERSED and REMANDED.

> THOMAS M. EAGAN and David T. Maloof, Maloof, Browne
> & Eagan, Rye, NY *for Plaintiff-Appellant*

> DAVID W. KENNA, Francis A. Montbach, and Christine W.
> Wong, Mound, Cotton, Wollan & Greengrass, New

---

[*] The Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation.

JOSÉ A. CABRANES, *Circuit Judge*:

This appeal arises from an effort by a shipper to recover from an air carrier for loss of goods transported by international air freight. We are asked to determine which version of the treaty governing air transportation was in effect between the United States and Belgium on March 9, 2001—the date on which the air carrier's waybill[1] in this case was issued. Specifically, the question presented is whether, at that time, the United States was a party to The Hague Protocol of 1955 that amended the Warsaw Convention of 1929.[2]

The United States District Court for the Southern District of New York (Robert W. Sweet, *Judge*) answered this question in the affirmative, holding that the United States had acceded to The Hague Protocol when it ratified Montreal Protocol No. 4 in 1998. Because we hold that the United States did not become a party to The Hague Protocol until after the Senate consented to the

---

[1] A "waybill" is "a document that is prepared by the carrier . . . transporting a shipment of goods, that contains such information as the nature of the shipment, the name of its consignor and consignee, its origin, route, destination, and the charges paid, and that serves as a means of identification, a guide for routing, and a basis for freight accounting and almost all other carrier records and statistics." *Webster's Third New International Dictionary* 2588 (1976).

[2] The Warsaw Convention is a multilateral treaty that regulates, *inter alia*, liability for international air carriers. Originally adopted in Warsaw in 1929, it was amended at The Hague in 1955 and again in Montreal in 1975. *See* Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. 11, *reprinted in note following* 49 U.S.C. § 40105 ("Original Warsaw Convention"); The Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 478 U.N.T.S. 371 ("The Hague Protocol"); Montreal Protocol No. 4 To Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 2145 U.N.T.S. 36 ("Montreal Protocol No. 4").

As we explained in *Chubb & Son, Inc. v. Asiana Airlines*, 214 F.3d 301 (2d Cir. 2000):

> The Warsaw Convention "system" includes the various laws, treaties and individual contracts governing the international transportation of persons, baggage, and goods by air. No one treaty or contract governs the relationships of one State with other States. A single State might be bound to one version of the Warsaw Convention with one State, another version of the Warsaw Convention with another State, a separate bilateral treaty with another State, and a separate contract with a private party.

*Id.* at 306.

Protocol's ratification on July 31, 2003, *see* S. Treaty Doc. No. 107-14 (2003), we reverse the judgment of the District Court and remand for further proceedings consistent with this opinion.

## BACKGROUND

On March 9, 2001, American Airlines, Inc. ("defendant" or "AA") issued an air waybill to Asco Industries, N.V. ("Asco") for the carriage of five crates from Brussels, Belgium to Tulsa, Oklahoma. The waybill listed Chicago as the only stop en route, but, due to rescheduling, the cargo was shipped through Dallas. Only one of the five crates arrived in Tulsa. On August 16, 2002, this action for damages for the loss of the other four crates was brought against AA by Asco's subrogated underwriter, Royal & Sun Alliance Insurance ("plaintiff").

In the District Court, defendant airline maintained that its liability for the lost crates was limited to $20 per kilogram by Article 22(2) of the Original Warsaw Convention.[3] *See* note 2, *ante*. Plaintiff responded that defendant could not take advantage of the limitation on liability set forth in Article 22(2) of the Original Warsaw Convention because defendant had failed to comply with the requirements of Articles 9 and 8(c) of the Convention, both of which had to be fulfilled in order to trigger Article 22(2)'s limitation of liability. Article 9 states that "if the air waybill does not contain all the particulars set out in article 8(*a*) to (*i*) . . . , the carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability." 49 Stat. at 3017. In turn, Article 8(c) requires that "[t]he air waybill shall contain . . . [t]he agreed stopping places." *Id.* at 3016.

---

[3] Article 22(2) of the Original Warsaw Convention provides, in relevant part:

> In the transportation of checked baggage and of goods, the liability of the carrier
> shall be limited to a sum of 250 francs per kilogram, unless the consignor has made,
> at the time when the package was handed over to the carrier, a special declaration
> of the value at delivery and has paid a supplementary sum if the case so requires.

49 Stat. at 3019. Article 22(4) further provides that the monetary amounts designated in French francs "may be converted into any national currency in round figures." *Id.* The parties do not dispute that, if Article 22(2) applies, the relevant dollar amount is $20 per kilogram.

Plaintiff alleged that defendant had not met these requirements—and could not limit its liability pursuant to the treaty—because defendant's air waybill listed Brussels, Chicago, and Tulsa, but the shipment was re-routed through Dallas.[4]

Defendant replied that in 2001 the United States and Belgium both adhered, not to the Original Warsaw Convention, but to the amended version adopted by The Hague Protocol of 1955, *see* note 2, *ante*, and that Article VI of The Hague Protocol deleted most of the "air consignment note" requirements of the Original Warsaw Convention, including the "agreed stopping places" requirement of Article 8(c). *See* 478 U.N.T.S. at 379.

On February 21, 2003, plaintiff moved for partial summary judgment on the limited liability issue, urging that the United States had not yet ratified The Hague Protocol at the time the air waybill was signed (March 9, 2001), and that the unamended Original Warsaw Convention therefore governs the instant dispute. Defendant opposed the motion on the ground that the United States had acceded to The Hague Protocol on March 4, 1999, when the United States' ratification of Montreal Protocol No. 4, *see* note 2, *ante*, took effect.

On July 23, 2003, the District Court denied plaintiff's motion for partial summary judgment, finding that the United States had acceded to The Hague Protocol by virtue of its ratification of Montreal Protocol No. 4 in 1998. *See Royal & Sun Alliance Ins. v. Am. Airlines, Inc.*, 277 F. Supp. 2d 265, 267 (S.D.N.Y. 2003). On March 13, 2004, the parties agreed to a stipulated judgment, subject to plaintiff's right to appeal the District Court's denial of partial summary judgment. That appeal is now before this Court.

---

[4] Defendant argued that the re-routing did not render Dallas an "agreed stopping place[ ]" that had to be listed in the waybill under Article 8(c). The District Court did not resolve this question because, as explained further below, it found Article 8(c) to be inapplicable for other reasons.

**DISCUSSION**

We review a grant or denial of summary judgment *de novo*. *See Schwan-Stabilo Cosmetics GmbH & Co. v. PacificLink Int'l Corp.*, 401 F.3d 28, 31 (2d Cir. 2005). For the reasons that follow, we hold that the District Court erred in finding that The Hague Protocol of 1955 governs the present dispute. When the United States ratified Montreal Protocol No. 4 in 1998 (effective March 4, 1999), it did not accede to The Hague Protocol. Rather, it expressed an intention *not* to be bound by The Hague Protocol against States that, like Belgium, were not parties to Montreal Protocol No. 4. This intention is evident from the treaty language and is not overcome by any "secondary" evidence of the United States' intentions. We therefore reverse the District Court's denial of plaintiff's motion for partial summary judgment and remand the cause to the District Court. We further direct the District Court to grant plaintiff's motion for partial summary judgment consistent with our holding that the Original Warsaw Convention governs the instant dispute.

**A.     The Law of Treaties**

We look principally to two factors in determining whether a particular international agreement constitutes binding treaty law in the United States: (1) whether the United States has consented to be bound by that agreement, and (2) whether that agreement, by its terms, has entered into force as of the date in question.

**1.     Consent To Be Bound**

The Constitution vests the President with the "Power, by and with the Advice and Consent of the Senate, to Make Treaties, provided that two thirds of the Senators present concur." U.S. Const. art. II, § 2, cl. 2. This and other "'constitutional provisions have come to be regarded as explicit textual manifestations of the inherent presidential power to administer . . . the foreign policy of the United States.'" *Tachiona v. United States*, 386 F.3d 205, 213 (2d Cir. 2004) (quoting Laurence H. Tribe, *American Constitutional Law* § 4-3, at 638 (3d ed. 2000)). While the President alone has the

5

authority to negotiate and ratify treaties, *see United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936), he cannot act unilaterally, *see Tachiona*, 386 F.3d at 212; *see also The Federalist No. 69* (Alexander Hamilton) (reprinted in IV *The Papers of Alexander Hamilton* 595-96 (Harold C. Syrett ed., 1962) (1788)) (noting that whereas the "King of Great-Britain is the sole and absolute representative of the nation in all foreign transactions," the President of the United States "can only [enter into treaties] with the concurrence of a branch of the Legislature"). A self-executing treaty[5] becomes "the law of this land," *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 167 (1999) (internal quotation marks omitted), only after it has been (1) duly consented to by the Senate, and (2) ratified by the President, *see N.Y. Indians v. United States*, 170 U.S. 1, 23 (1898) (declining to give effect to a treaty proviso adopted by the Senate, but not sanctioned or approved by the President).

The term "ratification" is often inadvertently or informally used to describe a vote by the Senate consenting to a treaty that has been sent to the Senate by the President for legislative consideration. *See, e.g.*, *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276 n.21 (1991) (observing that the "Senate alone" has the "power . . . to ratify treaties"); *Haver v. Yaker,* 76 U.S. (9 Wall.) 32, 35 (1869) (noting that the United States is bound by a treaty only after "the Senate, in whom rests the authority to ratify it, . . . agree[s] to it"); *see also* Lord McNair, *The Law of Treaties* 129-30 (1961) ("The word 'ratification' . . . [is] loosely and popularly [used to

---

[5] "[A] self-executing treaty is domestic law. It 'operates of itself,' as 'a rule for the Court,' 'equivalent to an act of the legislature.'" *Medellin v. Dretke*, 125 S. Ct. 2088, 2103 (2005) (O'Connor, J, dissenting) (quoting *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829)); *see also Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 257 n.34 (2d Cir. 2003) ("Self-executing treaties are those that immediately create rights and duties of private individuals which are enforceable and are to be enforced by domestic tribunals.") (internal quotation marks, alterations, and citations omitted). By contrast, "[n]on-self-executing treaties require implementing action by the political branches of government or are otherwise unsuitable for judicial application." *Flores*, 414 F.3d at 257 n.34 (internal quotation marks, alterations, and citations omitted); *see also Igartúa-De La Rosa v. United States*, 417 F.3d 145, 150 (1st Cir. 2005) (en banc) (Boudin, C.J.) ("The United States has signed numerous treaties over the years, many containing highly general and ramifying statements. Some as negotiated by the President are merely aspirational and not law in any sense. Others may comprise international commitments, but they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms. The law to this effect is longstanding.") (citations omitted).

mean] the approval of the legislature . . . ; this is an unfortunate use of the word and should be avoided."). However, as a matter of international law—the law governing relations among States *inter se*—Senate consent is *not* synonymous with "ratification." *See* 1 *Oppenheim's International Law* 1226 (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed. 1996) ("['Ratification'] must be distinguished from parliamentary or other domestic ratification (or approval) of a treaty . . . ."). Nor does the Senate's approval, by itself, constitute consent to be bound by an international agreement. Under the domestic or "municipal" law of the United States, it is the province of the Senate to give its consent *vel non* to the treaty negotiated by the President and submitted to the Senate for its consideration; and if two thirds of the Senators present vote in favor of that treaty, the President may ratify it. *See* U.S. Const. art. II, § 2, cl. 2; Cong. Research Serv., *Treaties and Other International Agreements: The Role of the United States Senate* 117, 106th Cong. (Comm. Print 2001) ("It is the President who negotiates and ultimately ratifies treaties of the United States, but only if the Senate in the intervening period gives its advice and consent." ); *see also* Restatement (Third) of Foreign Relations of the United States § 303 Reporter's Note 3 (1987) ("Restatement (Third)") (recognizing that it is the "President [who] makes, ratifies, or accedes to a treaty on behalf of the United States," while "the Senate gives its consent to ratification").

Although a State's consent to be bound by an international agreement can take many forms,[6]

---

[6] Article 11 of the Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ("Vienna Convention"), recognizes that "[t]he consent of a State to be bound by a treaty may be expressed by signature, exchange of instruments constituting a treaty, ratification, acceptance, approval or accession, or by any other means *if so agreed*." 1155 U.N.T.S. at 335, art. 11 (emphasis added); *see also* Ian Brownlie, *Principles of Public International Law* 583 (6th ed. 2003) ("[R]atification . . . [is] not the only means by which consent to be bound may be expressed. Any other means may be used if so agreed, for example an exchange of instruments constituting a treaty.").

7

including formal accession to the treaty's provisions after the treaty has already entered into force,[7] ratification "remains the most common form . . . by which a state becomes bound by an international agreement." Lung-chu Chen, *An Introduction to Contemporary International Law* 271 (1989).

The Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ("Vienna Convention"), which we rely upon "as an authoritative guide to the customary international law of treaties,"[8] *Chubb & Son, Inc. v. Asiana Airlines*, 214 F.3d 301, 308-09 & n.5 (2d Cir. 2000), defines

---

[7] "Accession" is "the act whereby a State accepts the offer or the opportunity of becoming a party to a treaty already signed by some other States . . . ." Lord McNair, *ante*, at 149 (footnote omitted); *see also* Vienna Convention, 1155 U.N.T.S. at 335, art. 11 (recognizing that a State may express its consent to be bound by a treaty through accession). "Accession may occur before or after the treaty has entered into force. The conditions under which accession may occur and the procedure involved depend on the provisions of the treaty." Brownlie, *ante*, at 583. If the terms of a treaty so state, ratification of one treaty may signal consent to be bound by, or "accession" to, another. For example, in 1968 the United States formally ratified the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577. The Protocol, by its terms, bound party States to comply with certain provisions of the Convention Relating to the Status of Refugees, 189 U.N.T.S. 137, 150 (July 28, 1951). *See* 19 U.S.T. at 6225, art. I(1); *INS v. Stevic*, 467 U.S. 407, 416 (1984); *see also Auguste v. Ridge*, 395 F.3d 123, 142 (3d Cir. 2005) ("'A treaty that is ratified *or acceded to* by the United States with a statement of understanding becomes effective in domestic law subject to that understanding.'") (quoting Restatement (Third) § 314 cmt. d) (emphasis added).

Although, in some cases, a State may accede to a treaty without going through the formal process of ratification, "[n]o State, uninvited, has a right by means of accession to make itself a party to a treaty between two or more States." Lord McNair, *ante*, at 151. The terms of Article 15 of the Vienna Convention confirm that:

The consent of a State to be bound by a treaty is expressed by accession when:

(a) The treaty provides that such consent may be expressed by that State by means of accession;

(b) It is otherwise established that the negotiating States were agreed that such consent may be expressed by that State by means of accession; or

(c) All the parties have subsequently agreed that such consent may be expressed by that State by means of accession.

1155 U.N.T.S. at 336, art. 15; *see also* 1 *Oppenheim's International Law*, *ante*, at 1237 ("It is difficult to establish that a state which has not formally acceded to a treaty to which it could have acceded has nevertheless in some way become a party to it by some informal procedure . . . .").

[8] Although we have previously recognized the Vienna Convention as a source of customary international law, it bears underscoring that the United States has never ratified the Convention. *See Chubb*, 214 F.3d at 308-09 & n.5. Accordingly, the Vienna Convention is not a primary source of customary international law, but rather one of the secondary sources "*summarizing* international law," *Flores*, 414 F.3d at 251 (emphasis added), that we rely upon "only insofar as they rest on factual and accurate descriptions of the past practices of states," *United States v. Yousef*, 327 F.3d 56, 90 (2d Cir. 2003); *see also Flores*, 414 F.3d at 248 ("[A] principle is only incorporated into customary international law if

8

ratification as one of "the international act[s] . . . whereby a State establishes on the international plane its consent to be bound by a treaty," 1155 U.N.T.S. at 333, art. 2(b); *see also* Brownlie, *ante*, at 583 ("Ratification . . . is an important act involving consent to be bound."); Lord McNair, *ante*, at 130 (describing "ratification" as the process through which a treaty is brought "into force"). Article 14 of the Vienna Convention provides in relevant part that:

> The consent of a State to be bound by a treaty is expressed by ratification when:
>
> (a)    The treaty provides for such consent to be expressed by means of ratification;
>
> (b)    It is otherwise established that the negotiating States were agreed that ratification should be required;
>
> (c)    The representative of the State has signed the treaty subject to ratification; or
>
> (d)    The intention of the State to sign the treaty subject to ratification appears from the full powers of its representative or was expressed during the negotiation.

1155 U.N.T.S. at 335-36.

The ratification process, in whatever form it may take, *see* 1 *Oppenheim's International Law*, *ante*, at 1231 ("No rule of international law prescribes a necessary form of ratification . . . ."), serves several functions. First and foremost, "it affords a state the chance to scrutinize closely the provisions of a complicated agreement" after signing it.[9] Lord McNair, *ante*, at 130; *see also* 1 *Oppenheim's International Law*, *ante*, at 1227 ("The need for an institution such as ratification is

---

States accede to it out of a sense of legal obligation."); *Yousef*, 327 F.3d at 91 n.24 (2d Cir. 2003) (noting that "[c]ustomary international law is comprised of those practices and customs that States view as obligatory and that are engaged in or otherwise acceded to by a preponderance of States in a uniform and consistent fashion"); *Chubb*, 214 F.3d at 308 ("The United States Department of State considers the Vienna Convention in dealing with day-to-day treaty problems and recognizes the Vienna Convention as in large part the authoritative guide to current treaty law and practice.") (internal quotation marks omitted).

[9] "Under general principles of treaty law, a State's *signing* of a treaty serves only to 'authenticat[e]' its text; it 'does not establish [the signatory's] consent to be bound.'" *Flores*, 414 F.3d at 256 (alteration and emphasis in original) (quoting Brownlie, *ante*, at 582).

9

principally that, for various reasons, states need time after agreement has been reached upon a definitive text of a treaty before they feel able to commit themselves to it."). In addition, in the time between signing and ratification, States are able, *inter alia*, (1) to effect changes in domestic law that may be necessary for the implementation of a treaty, (2) to seek and obtain the consent of legislative bodies as may be required, and (3) to re-examine the relevant provisions before committing to them. *See id.*

As we recognized in *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003), a "State only becomes bound by—that is, becomes a party to—a treaty when it ratifies the treaty." We must therefore inquire whether the United States has ratified a treaty, or otherwise acceded to its provisions, *see* note 7, *ante*, in order to determine whether or not the United States has consented to be bound by that treaty.

### 2. Entry into Force

In addition to consent to be bound, a treaty must have entered into force in order to constitute law that binds a ratifying State it in its relations with other States. *See Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 373 (2d Cir. 2004). Article 28 of the Vienna Convention confirms that, "[u]nless a different intention appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party." 1155 U.N.T.S. at 339; *see also* Restatement (Third) § 322(1) (same). Accordingly, we have recognized that, "[o]rdinarily, a particular treaty does not govern conduct that took place before the treaty entered into force." *Ehrlich*, 360 F.3d at 373 (citing *Chubb*, 214 F.3d at 307 n.4); *see also* 1 *Oppenheim's International Law*, *ante*, at 1239.

Upon ratification, an international agreement comes into force in accordance with its terms. *Id.*; *see also* Lord McNair, *ante*, at 191 ("The law leaves to the parties complete liberty to fix the date

10

on which the treaty will enter into force, and they usually do this by express provision in the treaty . . . .").  Some treaties enter into force by virtue of the passage of time.  *See, e.g.*, Treaty of Friendship, Commerce and Navigation, Apr. 2, 1953, U.S.-Japan, 4 U.S.T. 2063, 2080, art. XXV(2) ("The present Treaty shall enter into force one month after the day of exchange of ratifications."). In the case of some multilateral treaties, a treaty may enter into force only after a certain proportion of States have deposited instruments of ratification, approval, acceptance, or accession with the depositary.  *See, e.g.*, Comprehensive Test Ban Treaty, art. XVI(1), opened for signature Sept. 24, 1996, 35 I.L.M. 1439, 1457, art. XIV (treaty not yet in force) ("This Treaty shall enter into force 180 days after the date of deposit of the instruments of ratification by all States listed in Annex 2 to this Treaty, but in no case earlier than two years after its opening for signature.").  In other cases, States may require that other States ratify the agreement before the treaty enters into force.  *See, e.g.*, Charter of the United Nations, art. 110, cl. 2, 59 Stat. 1031, 1054 ("U.N. Charter") ("The [U.N.] Charter shall come into force upon the deposit of ratifications by the Republic of China, France, the Union of Soviet Socialist Republics, the United Kingdom of Great Britain and Northern Ireland, and the United States of America, and by a majority of the other signatory states.").  And in other cases still, a treaty will only enter into force at a specified time after a certain number of States have deposited instruments signifying their accession with the depositary.  *See, e.g.*, Rome Statute of the International Criminal Court, art. 126(1) (effective July 1, 2002), 37 I.L.M. 999, 1068 (United States not bound because not a party) ("This Statute shall enter into force on the first day of the month after the 60th day following the date of the deposit of the 60th instrument of ratification, acceptance, approval or accession with the Secretary-General of the United Nations."); *see also* U.N. Charter, art. 102(1), 59 Stat. at 1052 ("Every treaty and every international agreement entered into by any Member of the United Nations after the present Charter comes into force shall as soon as possible be registered with the Secretariat and published by it.").

11

In all cases, however, we will look to see whether a treaty ratified by the President of the United States has entered into force[10] in order to determine whether that treaty is binding on the United States and, by its terms or pursuant to action of the Senate and the President, enforceable in our courts.

**B.      Treaties at Issue**

We have recognized that whether a dispute "arising out of the international carriage of goods by air is governed by a given substantive treaty . . . depends on whether the places of departure and destination are within the territories of two contracting parties to that treaty." *Chubb*, 214 F.3d at 307. Accordingly, we must identify the air transportation treaty, if any, to which both Belgium and the United States were a party on March 9, 2001, the date of the issuance of the air carrier waybill in question.[11]

The Original Warsaw Convention was adopted in 1929. *See* note 2, *ante*. It entered into force in accordance with its terms in 1933, ninety days after the fifth instrument of ratification belonging to a party State was deposited with the Ministry of Foreign Affairs of Poland. *See* Original Warsaw Convention, 49 Stat. at 3022, art. 37. The United States ratified the Convention in 1934, effective the same year. *Id.* at 3013. Belgium ratified it in 1936, effective the same year.

The Hague Protocol, which amended the Original Warsaw Convention, was adopted at an international conference at The Hague in 1955. *See* note 2, *ante*. It entered into force in accordance with its terms in 1963, ninety days after the thirtieth instrument of ratification belonging to a party State was deposited with the Government of the People's Republic of Poland. *See* The Hague

---

[10] The day a multilateral treaty "enters into force" among party States may very well be distinct from the day the United States' ratification of that treaty becomes "effective." This may happen, for example, because the United States is not an original party to a treaty, but ratifies the treaty after the treaty has already entered into force among party States in accordance with its terms. As with the date a treaty is entered into force, the date a State's ratification becomes effective is determined by (1) the terms of the treaty and (2) the terms of the ratifying State's consent to be bound.

[11] We summarize our analysis graphically in Figure 1.

12

Protocol, 478 U.N.T.S. at 387, art. XXII. Belgium ratified The Hague Protocol in 1963, effective the same year. Although the United States signed The Hague Protocol in 1956, *id.* at 404; *see* note 9, *ante* (on the significance of a State "signing" a treaty), as of March 9, 2001—the date when AA issued the air waybill to Asco—the Senate had not given its "advice and consent" to ratification.[12]

Yet another related treaty, Montreal Protocol No. 4—which amended the Original Warsaw Convention as amended by The Hague Protocol—was adopted in 1975. *See* note 2, *ante.* It entered into force in accordance with its terms in 1998, ninety days after the thirtieth instrument of ratification belonging to a party State was deposited with the Government of the People's Republic of Poland. *See* Montreal Protocol No. 4, 2145 U.N.T.S. at 44, art. XVIII; U.S. Dep't of State, *Treaties in Force* 343 (2002) ("*Treaties in Force*"). Although Belgium did not ratify Montreal Protocol No. 4, the United States ratified Montreal Protocol No. 4 in 1998, effective March 4, 1999. *Id.* Article XVII of Montreal Protocol No. 4 provides that ratification of Montreal Protocol No. 4 by a State that, like the United States, was not a party to The Hague Protocol "shall have the effect of accession to the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975." 2145 U.N.T.S. at 44, art. XVII(2).

After the events giving rise to the present action, in 2002, the Department of State acknowledged "the difficult question of whether the United States, by reason of its adherence to Montreal Protocol No. 4 became a party to The Hague Protocol and therefore entered into treaty

---

[12] In 1959, President Eisenhower submitted The Hague Protocol to the Senate for its "advice and consent" to ratification. As the Department of State recently explained,

> [b]ecause of concerns regarding the inadequacy of the new limit on passenger recoveries, the [Eisenhower] Administration sought enactment of a form of accident insurance legislation in conjunction with ratification of the Protocol. . . . The insurance legislation package failed, and The Hague Protocol was eventually returned to the President [without Senate consent] in 1967.

Letter of Submittal by Secretary of State Colin L. Powell, June 15, 2002, S. Treaty Doc. 107-14, at vi.

relations under The Hague Protocol with other countries party to that instrument (but not to Montreal Protocol No. 4)." Letter of Submittal by Secretary of State Colin L. Powell, June 15, 2002, S. Treaty Doc. 107-14, at ix. In order to "seek certainty" on that score, the George W. Bush administration re-transmitted The Hague Protocol to the Senate for "advice and consent." *Id.* The Senate approved The Hague Protocol on July 31, 2003, *see id.*, and it was ratified by President Bush effective December 14, 2003, *see* U.S. Dep't of State, *Treaties in Force* 350 (2004).

It is therefore undisputed that the United States had not ratified The Hague Protocol as of March 9, 2001, the date of the issuance of the air waybill in the instant case. The question remains, however, whether the United States had *acceded* to the provisions of The Hague Protocol by virtue of its ratification of Montreal Protocol No. 4 in 1998. *See* note 7, *ante*. Accordingly, we must determine whether the United States' ratification of Montreal Protocol No. 4 constituted consent to be bound to one treaty—namely, the "Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975"—or consent to be bound by two treaties—namely, (1) "the Warsaw Convention as amended at The Hague, 1955" *and* (2) a separate treaty called "Protocol No. 4 of Montreal, 1975."

If, by accession to Montreal Protocol No. 4, a State accedes to only one treaty, then the treaty in effect between Belgium and the United States on March 9, 2001 was the Original Warsaw Convention, since, at the time, the United States had not ratified The Hague Protocol and Belgium had not ratified Montreal Protocol No. 4. If, however, through ratification of Montreal Protocol No. 4, a State consents to be bound by two treaties, the treaty in effect between Belgium and the United States in 2001 was The Hague Protocol, which Belgium ratified directly and the United

14

States acceded to through its ratification of Montreal Protocol No. 4, effective March 4, 1999.[13]

## C.     Best Evidence: Treaty Language

To determine whether a State that acceded to Montreal Protocol No. 4 intended to bind itself to The Hague Protocol vis-à-vis States that had become parties to The Hague Protocol but not Montreal Protocol No. 4, we must begin with the text of Montreal Protocol No. 4 itself, which provides "the best evidence of . . . its parties' intent." *See United States v. Stuart*, 489 U.S. 353, 372 (1989) (Scalia, J., concurring).

Two provisions of Montreal Protocol No. 4 are relevant here. Article XV provides:

> As between the Parties to this Protocol, the Warsaw Convention as amended at The Hague in 1955 and this Protocol shall be read and interpreted together as *one single instrument* and shall be known as the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975.

2145 U.N.T.S. at 43 (emphasis added). Article XVII(2) of Montreal Protocol No. 4 provides:

> Ratification of this Protocol by any State which is not a Party to the Warsaw Convention or by any State which is not a Party to the Warsaw Convention as amended at The Hague, 1955, shall have the effect of accession to the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975.

*Id.* at 44. Thus, "the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975 " is clearly defined in Article XV as constituting "one single instrument." Applying that definition to Article XVII(2), it appears that ratification of Montreal Protocol No. 4 "by [a] State which is not a Party to the Warsaw Convention as amended at The Hague 1955," such as the United States, "[has] the effect of accession to" "one single instrument," namely, "the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975." Therefore,

---

[13] Because the United States explicitly ratified The Hague Protocol in 2003, the practical significance of our decision is limited to whether the United States was party to The Hague Protocol in the period between March 4, 1999 (when Montreal Protocol No. 4 went into effect for the United States) and December 14, 2003 (when The Hague Protocol went into effect for the United States as a separate treaty).

15

according to the plain terms of the treaty, by ratifying Montreal Protocol No. 4, a State consents to be bound by one instrument consisting of the combination of three related treaties (and *not* by an additional instrument consisting of a combination of two related treaties—The Hague Protocol and Montreal Protocol No. 4).

We note, moreover, that this construction is consistent not only with the text of Montreal Protocol No. 4, but also with the rule of customary international law stated in Article 40(5) of the Vienna Convention. *See Chubb*, 214 F.3d at 308-10 (noting that we rely on the Vienna Convention to aid us in our determination of "whether a treaty relationship exists" between two States). Article 40(5) provides that:

> Any State which becomes a party to the treaty after the entry into force of the amending agreement shall, *failing an expression of a different intention* by that State:
>
> (a) be considered as a party to the treaty as amended; and
>
> (b) be considered as a party to the unamended treaty in relation to any party to the treaty not bound by the amending agreement.

1155 U.N.T.S. at 345 (emphasis added). Thus, under the customary international law of treaties restated in the Vienna Convention, the United States cannot be "considered as a party" to The Hague Protocol if it rendered "an expression of a different intention" when it ratified Montreal Protocol No. 4.

In our decision in *Chubb*, we clarified the terms by which a State may express such a "different intention" by applying Article 40(5) of the Vienna Convention to circumstances similar to those presented here. Specifically, we considered what treaty relationship, if any, existed between the United States and the Republic of South Korea ("South Korea") in 1995, when "the United States had ratified the Original Warsaw Convention but not the Hague Protocol, while South Korea had adhered to the Hague Protocol but not the Original Warsaw Convention." *Chubb*, 214 F.3d at

16

307.  We held that South Korea was not party to the Original Warsaw Convention under Article

40(5)(b) because parties to The Hague Protocol, including South Korea, "expressed an intention not

to be bound to the Original Warsaw Convention." *Id.* at 310.  We stated that this  intention was

expressed by two provisions of The Hague Protocol.  First, Article XIX of The Hague Protocol,

which provides:

> As between the Parties to this Protocol, the Convention and the
> Protocol shall be read and interpreted together *as one single instrument*
> and shall be known as the *Warsaw Convention as amended at The Hague,*
> *1955.*

478 U.N.T.S. at 387 (first emphasis added).  Second, Article XXIII(2), which provides:

> Adherence to this Protocol by any State which is not a Party to the
> Convention shall have the effect of adherence to the Convention *as*
> *amended by this Protocol.*

*Id.* (emphasis added).  Relying on these two provisions, we concluded that "when South Korea

adhered to the Hague Protocol, it indicated its intention not to be bound to the Original Warsaw

Convention." *Chubb*, 214 F.3d at 310.  Consequently, we held that Article 40(5)(b) of the Vienna

Convention was inapplicable and that South Korea did not have a treaty relationship with the

United States under the Original Warsaw Convention.

In so holding, we acknowledged that our decision was compelled, not only by the express

language of the treaty at issue, but also by "the doctrine of the Separation of Powers," which

precludes us from "'alter[ing], amend[ing], or add[ing] to any treaty, by inserting any clause, whether

small or great, important or trivial." *Id.* at 312 (quoting *In re The Amiable Isabella*, 19 U.S. (6 Wheat) 1,

71 (1821)).  As the Supreme Court recognized in *In re The Amiable Isabella*, it is our role to construe

international agreements, not to rewrite them.  19 U.S. (6 Wheat) at 71 ("[T]his Court does not

possess any treaty-making power.  That power belongs by the constitution to another department of

the government . . . .").  That same logic applies here and mandates that we construe the text of

17

Montreal Protocol No. 4 according to its plain terms and not deem the United States to have acceded to an international agreement unless such an intention to accede was made clear by appropriate actions of the political branches of Government. To that end, we note that Montreal Protocol No. 4 contains language that closely parallels the language that we held to be controlling in *Chubb.* Article XV of Montreal Protocol No. 4 tracks Article XIX of The Hague Protocol; and Article XVII(2) of Montreal Protocol No. 4 likewise tracks Article XXIII(2) of The Hague Protocol.

Despite this compelling textual evidence manifesting an intent *not* to be bound by The Hague Protocol, defendant urges that the word "and" in the last clause of Article XIX(2) of Montreal Protocol No. 4—"shall have the effect of accession to the Warsaw Convention as amended at The Hague, 1955, *and* by Protocol No. 4 of Montreal, 1975" (emphasis added)—indicates that the ratification of Montreal Protocol No. 4 "binds a nation to two separate treaties." Appellee's Br. at 10-11. We disagree. As a matter of common usage, the phrase "Treaty A as amended at City B and by Treaty C" describes one treaty, not two. Even more significantly, Article XV of Montreal Protocol No. 4 defines the phrase the "Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975"—including the word "and"—as the title of "one single instrument."

Therefore, consistent with the principles of treaty interpretation outlined in *Chubb* and the plain text of Montreal Protocol No. 4, we hold that the United States did not consent to be bound to The Hague Protocol (as a separate treaty) by virtue of its ratification of Montreal Protocol No. 4. Indeed, it expressed an intention to the contrary.

**D.   "Secondary" Evidence**

In finding that the United States intended to bind itself to The Hague Protocol by virtue of its accession to Montreal Protocol No. 4, the District Court relied on various items of "secondary" evidence—that is, evidence outside the treaty text—to determine the intention of the parties to

18

Montreal Protocol No. 4. *See Royal & Sun*, 277 F. Supp. 2d at 268. Such evidence may be useful where the intentions of the party States cannot be deduced by the treaty's plain language, *see Stuart*, 489 U.S. at 373 (Scalia, J., concurring) ("Only when a treaty provision is ambiguous have we found it appropriate to give authoritative effect to extratextual materials.") (citing *Air France v. Saks*, 470 U.S. 392, 400 (1985); *Nielsen v. Johnson*, 279 U.S. 47, 52 (1929)), but we need not rely upon such evidence here as the text of Montreal Protocol No. 4 is clear and, consequently, controlling.

We doubt, moreover, that, as a matter of United States law, we would hold that anything other than a clearly stated intention to accede to a treaty would bind the United States in the absence of formal ratification. *But see* Brownlie, *ante*, at 583 (noting that, as a matter of international law, "everything depends on the intention of the parties, where this is ascertainable, and [that] modern practice contains many examples of less formal agreements not requiring ratification [that were] intended to be binding by signature"). We note, however, that our review of the relevant "secondary" evidence in no way undermines our reading of Montreal Protocol No. 4. To the contrary, the evidence weighs substantially in favor of our "one treaty" interpretation.

As an initial matter, even if the United States had consented to be bound by The Hague Protocol, it does not appear that such accession would have become effective as of March 9, 2001, since, at that time, the United States had not complied with the express terms of The Hague Protocol for adherence through a means other than ratification to the treaty. Article XXIII of The Hague Protocol sets forth a procedure by which a State that is not a party to the Protocol may accede to it:

1.      This Protocol shall, after it has come into force, be open for adherence by any non-signatory State.

2.      Adherence to this Protocol by any State which is not a Party to the Convention shall have the effect of adherence to the Convention as amended by this Protocol.

3.	Adherence *shall be effected* by the deposit of an instrument of adherence with the Government of the People's Republic of Poland and shall take effect on the ninetieth day after the deposit.

478 U.N.T.S. at 387 (emphasis added).

It is undisputed that the United States had not deposited "an instrument of adherence . . . with the Government of the Republic of Poland" as of March 9, 2001 and therefore had not complied with the terms of Article XXIII for adherence through a means other than ratification.[14] Although we have not specifically held that the United States *must* fulfill treaty-mandated notice requirements—such as The Hague Protocol's "instrument deposit" obligation—in order for a self-executing treaty, ratified by the United States, to be enforceable in our courts, the Supreme Court has treated fulfillment of treaty-mandated notice as a factor in evaluating a State's intentions. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252-53 (1984). The rationale for requiring a State to deposit an instrument of adherence here is much stronger, where the underlying treaty mandates that such deposit be made in order to effectuate adherence through a means other than formal ratification.[15]

Plaintiff also notes that the 2002 edition of *Treaties in Force*, a publication of the Department of State, unambiguously states that "[t]he United States is *not* a party to the 1955 [Hague] protocol." While defendant correctly points out that the "absence" of a listing in *Treaties in Force* is "not

---

[14] It bears underscoring that, under the terms of The Hague Protocol, a State that ratifies The Hague Protocol "effect[s] [its] adherence" simply by ratifying it. *See* The Hague Protocol, 478 U.N.T.S. at 387, art. XXI(2) ("Ratification of this Protocol by any State which is not a Party to the Convention shall have the effect of adherence to the Convention as amended by this Protocol."). A ratifying State is still required to deposit instruments of ratification with the Government of the People's Republic of Poland, but such deposit is not a prerequisite to that ratification's effectiveness. *See id.* at art. XXI(3) ("The instruments of ratification shall be deposited with the Government of the People's Republic of Poland.").

[15] It is also not clear from the treaty terms whether the United States, as a nation whose representative "signed" the Protocol, may accede to The Hague Protocol through any means other than formal ratification. *See* The Hague Protocol, 478 U.N.T.S. at 387, art. XXIII(1) ("This Protocol shall, after it has come into force, be open for adherence by *any non-signatory State*.") (emphasis added); *id.* at art. XXI(1) ("This Protocol shall be subject to ratification by the signatory States."); *see also id.* at 404 (reflecting the signature of United States representative Joseph E. Jacobs, signed June 38, 1956, to The Hague Protocol); note 9, *ante* (on the significance of a State "signing" a treaty).

20

dispositive" of whether the United States is in fact a party to The Hague Protocol, this "absence" is surely corroborative. Appellee's Br. at 16. Moreover, defendant's use of the word "absence" is itself misleading. *Treaties in Force*, an authoritative compendium of treaties by the department of the Executive Branch of Government charged with the conduct of the foreign relations of the United States, does not merely exclude a reference to The Hague Protocol—it unequivocally states that the United States is *not* a party to The Hague Protocol.

Third, drafting notes support the assertion that Montreal Protocol No. 4 intended to bind State parties solely to one single instrument, entitled "the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975." Plaintiff brings to this Court's attention the following passage from the comments of the United States delegate to the Montreal Conference:

> The pattern followed in all the protocols was to refer to the so-called single instrument . . . an instrument which included the unrevised as well as the revised provisions. In Article [XV], the protocol now under discussion was designated as "the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975", and though this was a rather long title, the United States Delegation considered it important, in the interest of avoiding any ambiguity, to use it in subsequent clauses.

1 International Civil Aviation Organization, *The Treaty Minutes, International Conference on Air Law Montreal, September 1975*, at 315. This single-instrument, single-title understanding of Montreal Protocol No. 4 is consistent with our own interpretation of the treaty text.

Finally, the undisputed fact that the President of the United States re-transmitted The Hague Protocol to the Senate for its "advice and consent" in 2002 suggests that the United States did not accede to that instrument when it became a party to Montreal Protocol No. 4 in 1999.

Notwithstanding the foregoing, defendant, and the District Court in turn, rely on three items of "secondary" evidence in support of their claim that, by virtue of the United States' ratification of Montreal Protocol No. 4, the United States separately acceded to The Hague Protocol. This

21

evidence—(1) a Senate Report, (2) a letter from a Deputy Secretary of State, and (3) a statement of our Court in dictum—reflects genuine confusion regarding the implications of Montreal Protocol No. 4, but it does not override the treaty text or the United States' failure to comply with The Hague Protocol's formal requirement for accession.

First, the Senate Report on Montreal Protocol No. 4 contains contradictory indications. On the one hand, the Report states that ratification of Montreal Protocol No. 4 "will have the effect of binding that State to the terms of Warsaw as amended at The Hague, *as well as to Protocol 4*." S. Exec. Rep. 105-20, at 39 (1998) (emphasis added). This statement appears to support the "two treaties" interpretation advocated by defendant and adopted by the District Court. On the other hand, the Report contains only a *single* version of the consolidated treaty text that reflects *both* The Hague and Montreal amendments. This supports plaintiff's position that the United States had not acceded separately to The Hague amendments vis-á-vis States that had not adopted the Montreal amendments. Because the totality of the Senate Report is, at best, ambiguous, the Report does not override the intentions expressed in the plain text of Montreal Protocol No. 4.

Second, defendant relies on a transmittal letter from Deputy Secretary of State Strobe Talbott accompanying President Clinton's transmission to the Senate of the Montreal Convention (which is distinct from Montreal Protocol No. 4). That letter contains the following sentence:

> In accordance with the provisions of Montreal Protocol No. 4, the United States also became bound by the provisions of The Hague Protocol when it ratified Montreal Protocol No. 4.

J.A. 54-55 (Letter of Submittal by Deputy Secretary of State Strobe Talbott, June 23, 2000, at vi-vii ("Talbott Letter")). Although the District Court expressly relied on the Talbott Letter, *Royal & Sun*, 277 F. Supp. 2d at 267-68, the import of the letter's language is far from clear. All parties agree that, from the perspective of a State that is also a party to Montreal Protocol No. 4, the United States was "bound by the provisions of The Hague Protocol" (as amended by Montreal Protocol No. 4) by

22

virtue of having ratified Montreal Protocol No. 4. That is the sum and substance of the Talbott Letter. The narrow question raised in this case is not directly addressed in the Talbott Letter—namely, whether the United States became bound in this manner vis-á-vis States that are *not* parties to Montreal Protocol No. 4, but *are* parties to The Hague Protocol. On that score, the Talbott Letter is silent.

Finally, both defendant and the District Court rely on the following sentence from our opinion in *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 431 (2d Cir. 2001):

> The Hague Protocol . . . did not enter into force for the United States until another international agreement, Montreal Protocol No. 4, was ratified by the Senate on September 28, 1998 and became effective on March 4, 1999.

This sentence from *Fujitsu*, which is, in any case, dictum,[16] suffers from the same ambiguities as the Talbott Letter. It is not clear whether The Hague Protocol was "enter[ed] into force for the United States" vis-à-vis States that had not likewise acceded to Montreal Protocol No. 4, any possible suggestion in *Fujitsu* to the contrary notwithstanding.

## CONCLUSION

Because the "secondary" evidence presented by defendant does not cast into doubt the significance of the treaty's plain text, or otherwise undermine our prior conclusion that the United States did not consent be bound by The Hague Protocol by virtue of its consent to be bound by Montreal Protocol No. 4, we reverse the judgment of the District Court and hold that, on March 9, 2001, the United States had not yet consented to be bound by The Hague Protocol.

Accordingly, we reverse the District Court's denial of partial summary judgment and remand the cause for further proceedings consistent with this opinion.

---

[16] The events at issue in *Fujitsu* occurred in 1996. 247 F.3d at 426. Whether The Hague Protocol became effective in 1999 or 2003—the question posed here—was, therefore, irrelevant to the *Fujitsu* holding.

23



Figure 1